UNITED STATES of America,
Plaintiff–Appellee,

v.

Jose CONTRERAS,
Defendant–Appellant.

No. 90–1221.

United States Court of Appeals,
Seventh Circuit.

Argued April 8, 1991.

Decided July 19, 1991.

Lance C. Malina, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Div. and Barry R. Elden, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Jack P. Rimland, Stamos, Rimland, Halprin & Clark, Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, and CUDAHY and EASTERBROOK, Circuit Judges.

BAUER, Chief Judge.

A jury found Appellant Jose Contreras guilty of one count of conspiracy to distribute cocaine and marijuana in violation of 21 U.S.C. § 846. The district court entered judgment on this verdict and sentenced Contreras under the United States Sentencing Guidelines ("Guidelines") to 108 months of imprisonment, to be followed by four years of supervised release. In calculating Contreras' sentence, the district court enhanced Contreras' offense level by two points for obstruction of justice pursuant to Guidelines § 3C1.1. In this appeal, Contreras challenges the district court's application of that Guidelines section. We affirm.

I

The facts here are undisputed. Contreras supplied cocaine and marijuana to Ada Rosa Vega ("Rosa"), Rosa's husband Javier Medina, Rosa's son Orlando Vega, and Roy Rodriguez (we will refer for convenience to these latter four as "Rosa & Co."). Rosa & Co. were charged with various narcotics offenses in the same original indictment as Contreras, and each pleaded guilty. The government thereafter sought and obtained a superseding indictment charging only Contreras. Contreras pleaded not guilty and went to trial. Rosa and Medina testified for the government at Contreras' trial. The government's other principal witness was Agent John Gamboa of the Bureau of Alcohol, Tobacco and Firearms.

Gamboa testified that in early 1988 he infiltrated this drug distribution outfit and began making purchases from Rosa & Co. As is common in these undercover operations, Gamboa's purchases started small, but soon grew much larger. The largest, and last, drug deal went down on May 13, 1988. After some haggling over price, Gamboa arranged to buy on that date one kilogram of cocaine for $21,500 and 25 pounds of marijuana for $800 per pound. Gamboa arranged the May 13th deal, as well as the smaller, preceding deals, with Rosa & Co. He as yet did not know that Contreras was their source.

On the evening of May 13th, Gamboa and another undercover agent met Rosa and Medina at Rosa's apartment. After a telephone call by Rosa to Contreras to verify her instructions, the group drove to an alley near Contreras' house. Once they got to the alley, Contreras took control of the deal. Contreras first conferred with Medina, and then Gamboa—who, unbeknownst to the conspirators, was wearing a body wire—met Contreras for the first time. Contreras introduced himself as "Tony," which, according to Contreras' own testimony as well as the testimony of Rosa and Medina, was Contreras' street name. In that tape-recorded conversation in the alley on May 13th, Contreras and Gamboa discussed the details of the deal, including who would go fetch the drugs from Contreras' brother-in-law's house, when the money would be transferred, etc.

As it turns out, Contreras did not complete the deal as arranged, because he spotted a "narc car" and feared he was being set up. By the time Gamboa had calmed Contreras' fears, night had fallen. Gamboa and the surveillance agents decided for safety reasons to call off the deal. Later that night, federal agents arrested Rosa and Medina in front of Contreras' house, and Contreras was pinched about one month later.

Along with Agent Gamboa's testimony, the jury also received the tape of the Gamboa–Contreras conversation and the English translation thereof. In their testimony, Rosa and Medina also described the events of May 13th, which descriptions

dovetailed with the other evidence. Rosa and Medina added that they bought cocaine and marijuana from Contreras for other customers besides Gamboa.

After the government rested, Contreras took the stand in his own defense. Contreras told a markedly different tale about his relationship with Rosa and Medina and his activities on May 13th. Contreras testified that he was at his in-laws' house working on his brother's car when Medina drove up. He testified that the two of them went to a neighborhood tavern to have a beer, where they ran into Rosa. Shortly thereafter, Contreras returned to his in-laws', and he and Medina took his brother's car out for a test drive. The car checked out, so they returned it to Contreras' brother. Contreras' brother then drove Contreras and Medina back to Contreras' house, where they were met by Contreras' wife and Rosa. A few moments later, federal agents showed up and arrested Rosa and Medina—for what reason, Contreras did not know.

And that, according to Contreras, was what really happened on May 13th. As to Agent Gamboa, Contreras never met him:

Q [Defendant's Counsel]: Did you see Agent Gamboa [when your brother dropped you off at your house]?

A [Contreras]: No.

Q: Did you have any conversation with Agent Gamboa on that day?

A: No, sir.

Transcript of Trial Proceedings ("Trial Tr."), Vol. IV, p. 453. *See also id.* at 461. While on the stand, Contreras also denied ever selling cocaine or marijuana to Rosa or Medina. During cross-examination, Contreras repeated that he did not meet or see Agent Gamboa on May 13th:

Q [Cross-exam by the Government]: So it's your testimony that you didn't meet Agent Gamboa on May 13th, 1988?

A [Contreras]: No, I didn't meet him, ma'am.

Q: And it's your testimony that you did not negotiate with John Gamboa and Javier Medina for a drug transaction on that day?

A: No, at no time did I ever negotiate anything with either one of them.

*Id.* at 468–69.

Unpersuaded by these denials, the jury returned a verdict of guilty as charged. The district court denied Contreras' post-trial motion for a new trial and held a sentencing hearing on January 18, 1990. The presentence report recommended a two-level enhancement under Guidelines § 3C1.1 for obstruction of justice, and the court agreed:

The defendant, I believe, should receive the two-point enhancement or increase as a result of the perjurious testimony that was given. I believe the jury found, upon evaluating the defendant's testimony, ... that the Government had proven the elements of the crime beyond a reasonable doubt.

[I]n evaluating the jury's determination, as well as independently evaluating the defendant's testimony, I find that the defendant was not truthful on the witness stand, and, consequently, the two-level enhancement should be allowed.

Transcript of Proceedings on January 18, 1990 ("Sent. Tr."), p. 4. *See also id.* at 11 (In response to Contreras' complaint about the enhancement under § 3C1.1, the court stated, "[U]nder the circumstances of your case, I have to raise—or make the two-point raise, because I believe you testified untruthfully."). Based on its calculations, the court determined that the Guidelines range for Contreras was 108 to 135 months. The court chose to impose a sentence at the very bottom of that range. Contreras filed a timely appeal, raising the arguments discussed below.

## II

Guidelines § 3C1.1 provides:[1] "If the defendant willfully impeded or ob-

1. This and all other Guidelines provisions examined in this opinion are the amended versions effective November 1, 1989. As Contreras was sentenced January 18, 1990, the amendments effective November 1, 1990 do not apply—although their application would make no difference.

structed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense, increase the offense level by 2 levels." Application Note 1, which spells out the kind of conduct that is the target of this guideline, includes at subsection (c) "testifying untruthfully or suborning untruthful testimony concerning a material fact ... during a preliminary or grand jury proceeding, trial, sentencing proceeding, or any other judicial proceeding." Application Note 2 directs courts to evaluate "suspect testimony and statements" in the light most favorable to the defendant when applying this guideline, and Note 3 explains, "This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt is not a basis for application of this provision." The district court determined that the obstruction enhancement explicated in these provisions was warranted in this case. That determination will only be disturbed if "clear error" is shown. *United States v. Jackson,* 935 F.2d 832, 849 (7th Cir.1991); *United States v. Osborne,* 931 F.2d 1139, 1153 (7th Cir.1991).

■ In his first argument, Contreras attempts to do just that: establish that the application of Guidelines § 3C1.1 in this case was clearly erroneous. This is so, argues Contreras, because his testimony contained no specific perjurious statement other than his simple denial of any wrongdoing, and such a denial cannot be the basis for enhancement under Application Note 3. True, a simple denial of guilt—as in pleading not guilty, or saying to an arresting officer, "I didn't do anything"—cannot be the basis for an obstruction enhancement under § 3C1.1. *See United States v. Fiala,* 929 F.2d 285, 289–90 (7th Cir.1991) (defendant's statement to officer that he had nothing illegal in car was "denial of guilt" within meaning of Note 3); *United States v. Acosta–Cazares,* 878 F.2d 945, 953 (6th Cir.) (pleading not guilty is "denial of guilt" under Note 3), *cert. denied,* — U.S. —, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989). But Contreras did more than that. Despite the perils of so doing, Contreras decided to take the stand and tell the jury a story. According to that story, Contreras could not have been the "Tony" captured on tape discussing the details of the drug deal on May 13th, because he never met Agent Gamboa on that day, and he never dealt drugs. The jury and the district court found Contreras' story to be a batch of lies.[2] We find no error, "clear" or otherwise, in that finding, which constitutes sufficient support for the application of Guidelines § 3C1.1.

■ In his second argument, Contreras levels a more fundamental attack on Guidelines § 3C1.1. Contreras claims that § 3C1.1 is unconstitutional whenever it is applied to a defendant's trial testimony because "it has a chilling effect on the defendant's right to testify on his own behalf." Appellant's Brief at 12. This circuit has not yet had an opportunity to address this argument regarding Guidelines § 3C1.1, but our brothers and sisters in other circuits have, and they have been uniformly unimpressed. *See United States v. Batista–Polanco,* 927 F.2d 14, 21–22 (1st Cir. 1991) (listing cases from other circuits rejecting this argument). *See also United States v. Keys,* 899 F.2d 983, 988 (10th Cir.1990). As these other circuits have stated, this "chilling effect" challenge to § 3C1.1 is foreclosed by *United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1977). In *Grayson,* a pre-Guidelines case, the Supreme Court found "entirely frivolous" an essentially identical attack on the use at sentencing of a defendant's false testimony: "Assuming, *arguendo,* that the sentencing judge's consideration of defendants' untruthfulness in testifying has any chilling effect on a defendant's decision to testify falsely, that effect is entirely permissible. There is no right to commit perjury." *Id.* at 54–55, 98 S.Ct. at 2617–2618. The enactment of the

---

2. In contrast to *United States v. Lozoya–Morales,* 931 F.2d 1216, 1218–20 (7th Cir.1991), the record supporting the commission of perjury in this case contains more than just the jury's verdict, but also the specific, independent finding by the district court (quoted above) that Contreras was "not truthful on the witness stand."

Guidelines did nothing to change this notion; in fact, § 3C1.1 can be seen as merely the technical means by which sentencing courts can continue under the Guidelines to consider the kind of evidence approved by the Court in *Grayson.* Thus, we join the chorus and hold that Guidelines § 3C1.1 does not impinge upon any constitutionally protected right when applied to increase the sentence of a defendant who testifies untruthfully at trial.

■ Finally, Contreras launches one last constitutional attack on § 3C1.1, this one based on the eighth amendment. Section 3C1.1, like all other "Adjustments" provisions in chapter three of the Guidelines, alters a defendant's sentence by adjusting the base offense level rather than directly adjusting the sentence. This fact, added to the graduated nature of the sentencing table, means that § 3C1.1's two-level enhancement will carry a greater sting for defendants who start at the higher end of the table than at the lower end. For example, let's say defendant A's base offense level is 10, defendant B's base offense level is 30, and both reside in criminal history category II. Without § 3C1.1's two-level enhancement, A's sentencing range would be 8–14 months, and with it A's range would be 12–18 months. Assuming the court chose the highest possible sentence in the range, the real difference in punishment for A would be only four months. B, on the other hand, has it much worse. He would start at a range of 108–135 months, and the two-level enhancement would give him a range of 135–168 months. Again assuming the highest sentence, this is a

real difference in punishment of 33 months. Contreras argues that this scheme results in disproportionate punishment across cases for the same conduct (lying under oath), in violation of the eighth amendment's ban on cruel and unusual punishment. *See Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (explicating and applying the eighth amendment's general principle of proportionality).[3]

The first thing to note is that Contreras has focused on the wrong proportion. Although "the sentences imposed on other criminals in the same jurisdiction" is one "objective factor" to consider in the proportionality analysis, *Solem,* 463 U.S. at 291–92, 103 S.Ct. at 3010–11, the focus of the inquiry is not on punishment across cases but on whether the quantum of punishment *in a specific case* is proportionate to the crime for which the defendant has been convicted. And no small disproportion will do; courts rarely declare a sentence violative of the eighth amendment under this inquiry unless it is "grossly" or "significantly" disproportionate to the crime. *See id.* at 288, 303, 103 S.Ct. at 3008, 3016. All Contreras can point to here is the fact that the obstruction enhancement hits him harder than it would someone with a lower base offense level; a comparison that is wholly beside the point. In *United States v. Marshall,* 908 F.2d 1312 (7th Cir.1990) (en banc), *aff'd sub nom. Chapman v. United States,* —— U.S. ——, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), defendants raised a similar argument concerning sentence disparity across cases, although there the ar-

**3.** The continuing viability of *Solem's* holding that the eighth amendment contains a general proportionality guarantee came under fire recently in *Harmelin v. Michigan,* —— U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). Justice Scalia, writing at this point only for himself and the Chief Justice, opined that *Solem* was "simply wrong; the Eighth Amendment contains no proportionality guarantee." *Id.* at ——, 111 S.Ct. at 2686. He later qualified this statement by suggesting that the principle of proportionality might have some application in capital cases. *Id.* at ——–——, 111 S.Ct. at 2700–2701. The rest of the Court disagreed. Writing for himself and Justices O'Connor and Souter, Justice Kennedy concluded that the Court should adhere to

a "narrow proportionality principle" for both capital and noncapital cases, as that principle is supported by the eighth amendment and 80 years of jurisprudence. *Id.* at ——, 111 S.Ct. at 2701. In a dissent joined by Justices Blackmun and Stevens, Justice White concluded that "there can be no doubt" that the eighth amendment includes a proportionality principle, *id.* at ——, 111 S.Ct. at 2709, and Justice Marshall, in a separate dissent, essentially agreed. *See id.* at ——, 111 S.Ct. at 2719. Thus, although they no doubt disagree on the contours of the guarantee, a firm majority of the Court agrees that the eighth amendment's proportionality guarantee explicated in *Solem* remains viable.

gument was framed in substantive due process terms rather than eighth amendment "proportionality" terms. Despite this difference in framing, our statement rejecting the disparity argument in *Marshall* is apropos here: *"Defendants'* sentences bear rational relations to *their* offenses. That is all that the Constitution requires, unless criminal defendants are entitled to assert third parties' rights to better sentencing practices—which they are not." *Id.,* 111 S.Ct. at 1320 (emphasis in original; citations omitted). *See also Chapman,* 111 S.Ct. at 1928–29.

Which leads us to a second point. Even examining the disparate impact across cases of adjustments such as § 3C1.1, we find no constitutional infirmities. The difference in real punishment between our defendants A and B above flows from the difference in their base offense levels. Base offense levels are not chosen out of the air, but reflect the severity and scope of the particular offense at issue. Thus, the Guidelines link the sting inflicted by chapter three adjustments to the magnitude of the particular crime involved. Regarding § 3C1.1, that means that the real cost of the perjury depends upon the severity of the crime out of which the perjurer is trying to lie his way. In employing such a scheme, the Guidelines appear to tip the balance between individualized sentences and uniform sentences toward the former. *See generally United States v. Pinto,* 875 F.2d 143, 144–46 (7th Cir.1989). Perhaps, were he a member of the U.S. Sentencing Commission, Contreras would work the balance differently. As a constitutional proposition, however, the scheme adopted by the Guidelines passes muster.

### III

When a defendant decides to take the stand in his own defense, he runs several risks—for example, impeachment by prior convictions or other "bad act" evidence. When a defendant decides to take the stand and *lie,* he runs even more risks, including the chance of an increased sentence. In this case, Contreras took the stand and lied, and the district court, applying Guide-

lines § 3C1.1, made him pay the price. The court committed no error in its application of the Guidelines, nor are those Guidelines constitutionally infirm. Therefore, the sentence imposed by the district court is

AFFIRMED.