UNITED STATES of America, Plaintiff–Appellee,

v.

Bridget C. JONES and Johonnas J. Eicke, Defendants–Appellants.

Nos. 91–2162, 91–2163.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1992.

Decided Jan. 19, 1993.

Rehearing Denied April 20, 1993.

Patrick J. Chesley, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Springfield, IL, for the U.S.

Bruce D. Locher (argued), Springfield, IL, for Johonnas J. Eicke, defendant-appellant.

Curtis L. Blood (argued), Collinsville, IL, for Bridget C. Jones, defendant-appellant.

Before FLAUM and RIPPLE, Circuit Judges, and SHADUR, Senior District Judge.*

SHADUR, Senior District Judge.

Bridget C. Jones ("Jones")[1] and Johonnas J. Eicke ("Eicke"), who were convicted of bond-jumping-related offenses in a jury trial in the United States District Court for the Central District of Illinois,[2] present con-

---

* The Honorable Milton I. Shadur, of the Northern District of Illinois, is sitting by designation.

1. Jones, claiming a common law marriage between herself and her codefendant, requested below that she be addressed as Mrs. Jones–Eicke. That hyphenated usage also appears in her appellate briefs. We employ "Jones" to be consistent with the indictment, the usage by the

court below and the related *Jones* and *Sidener* opinions referred to a bit later.

2. Both defendants were found to have violated 18 U.S.C. § 371 by conspiring to have Jones jump bond, and both were also found guilty under 18 U.S.C. § 3146(a)—Jones by jumping bond, and Eicke by aiding and abetting her in doing so.

solidated appeals from sentences imposed on them under the United States Sentencing Guidelines ("Guidelines"). They argue principally (but not solely) that the district court erred by adjusting their sentences upward for obstructing justice by committing perjury.

En route to the resolution of their appeals we are also called on to address, at greater or lesser length, these subjects:

1. the responsibility that prosecutors and district courts share in ensuring that accurate facts and specific findings underlie Guidelines adjustments for obstruction of justice;

2. whether a defendant who obstructs justice by committing perjury while interposing an affirmative defense is entitled to a Guidelines credit for acceptance of responsibility; and

3. whether a court may impose a Guidelines fine without precisely determining the defendant's resources.

We conclude that the sentences imposed on both defendants should be affirmed in all respects.

### Background

Because of the nature of the crimes at issue here, it is unnecessary to recount the underlying offenses that led to Jones' original conviction for a massive (over $10 million) fraud—instead we will assume familiarity with our opinions in the related cases of *United States v. Jones,* 938 F.2d 737 (7th Cir.1991) and *United States v. Sidener,* 876 F.2d 1334 (7th Cir.1989). Nor need we set out the Odysseys of Jones' and Eicke's travels during the 2½ year period while Jones was in flight from her scheduled sentencing.

Indeed, it is not even necessary to our decision to rehearse in any detail the excuses that Jones offered at her trial here for her having skipped, or that Eicke offered up as to his own involvement. Instead we provide something of the flavor of those matters to convey part of the background for Judge Mills' stated perception at the sentencing hearing that both of them were liars.

At trial Jones testified that as far back as 1985 her late husband, Richard, had been the target of a number of death threats and attempts on his life.[3] She maintained that those threats came from a banker, a large American bank and the IRS.[4]

Jones further testified that after Richard Jones died the Aryan Nation, which she understood to be a white-supremacist paramilitary group whose suborganization, the Brotherhood, could carry out the Aryan Nation's threats against persons in prison, had threatened to kill her. She also maintained that she received threats from an ex-client, one El Clounch. According to Jones, additional telephonic and written death threats arrived on the Wednesday after her verdict came in.

Moreover, Jones claimed that on that Friday she had received a call from the widow of a former client. That caller, according to Jones, told her that IRS agents, the Assistant United States Attorney who had prosecuted her case and Judge Mills had put a contract out on her life. Jones testified that Eicke had told her that he had confirmed the contract on her life through independent sources, one of which was the CIA. In an offer of proof outside the presence of the jury, Eicke testified that he had been in contact with the CIA and that it had verified the threats.

### Sentencing Proceedings

There is little wonder that the jury was unpersuaded and found both defendants guilty, just as an earlier jury had found Jones guilty on all of the substantive charges against her. Then like the trial that preceded it, defendants' May 13, 1991 sentencing hearing provided Judge Mills with a handful. Jones appeared pro se, as she had done at trial, and court-appointed

---

3. Jones claimed that Richard Jones died an unnatural death. No evidence in the record supports her assertion.

4. According to Jones the IRS' motive stemmed from its fear that her late husband was to bring $17 trillion into the economy tax-free.

counsel represented Eicke.[5] Both defendants forced the district court to expend considerable time and energy reviewing baseless motions and legal arguments, many of them nearly incomprehensible—or if comprehensible, plainly frivolous.[6]

Their antics aside, each defendant advanced some clearly non-frivolous objections in the course of going over his or her presentence investigation report ("PSI"[7]). Most importantly, each objected to the two-level Guidelines increase for obstruction of justice. In rejecting those objections the district court accepted all of the statements of fact in the PSIs (some of which were in dispute) as true.

Thus Jones' PSI ¶ 35 provided in pertinent part:

35. At trial in this case, Bridget C. Jones testified that Johonnas J. Eicke had been in contact with the Central Intelligence Agency (C.I.A.) of the United States Government and that such agency had provided confirmation of a murder contract put out on Jones and her two male children. In a proffer made under oath by Johonnas J. Eicke at the trial in this case, he agreed with the information provided by Jones and stated that during the month of April, 1987, he communicated approximately 100 times with a C.I.A. agent he knew as Tony Escobedo.

Jones pointed out in objection that she had not in fact testified that Eicke had been in contact with the CIA. Instead she had said that Eicke had *told* her that he had done so. Consequently she urged that any obstruction-of-justice adjustment based on that PSI paragraph was inappropriate. As already stated, Jones also contended that the district court erred in failing to grant her a two-level reduction for acceptance of responsibility.

As for Eicke, his PSI ¶¶ 32 and 33 provided in pertinent part:

32. During the presentence interview conducted on December 13, 1990, he informed the probation officer of one alias identity. Information provided by the U.S. Attorney confirmed five other alias identities.

33. Additionally, in a proffer made under oath, the defendant testified that the CIA had a murder contract out on co-defendant Jones and her two children. Supposedly, Mr. Eicke had approximately 100 contacts with CIA agent Tony Escobedo concerning this matter. The U.S. Attorney wrote the CIA for confirmation and received a response indicating the CIA had no contact with the defendant or Mrs. Jones whatsoever. Pursuant to USSG 3C1.1, commentary (n. 3(f)), he

with the United States, and, therefore, not within the United States, but lawfully without the United States. And, therefore, not subject to ... jurisdiction....

That contention was also adopted by Jones as her own. Though neither defendant has renewed those arguments on appeal, it remains our responsibility to examine subject matter jurisdiction sua sponte (*Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280, 1282 (7th Cir.1986)). We have done so, and we reject the arguments.

---

5. Eicke had requested and obtained the appointment of counsel at the trial. However, even after he thus elected not to proceed pro se, Eicke demanded to speak for himself throughout the trial and insisted on expounding his views personally, regardless of whether they were germane or whether the court cautioned him against doing so. Both Judge Mills and Eicke's appointed counsel demonstrated remarkable patience during Eicke's performance.

6. For example, Eicke continued at sentencing an argument, originally made on the day of arraignment, that he was beyond the district court's jurisdiction. On the day of arraignment he had argued that jurisdiction was lacking because he was "a member of the sovereignty of Texas State"—which he of course distinguished from the State of Texas—while at sentencing he called a witness in an offer of proof to present this contention:

Eicke was not a Fourteenth Amendment person, nor a United States citizen, nor a United States person, nor a United States resident, but a nonresident, alien in lawful respect,

7. Two shorthand references for such reports—"PSR" and "PSI"—are found in the transcripts of the proceeding below. Our own opinions have not been internally consistent in that respect (compare, e.g., *United States v. Jackson*, 974 F.2d 57, 58 (7th Cir.1992) with *United States v. Coonce*, 961 F.2d 1268, 1271 (7th Cir.1992)). Even though PSR qualifies as a logical acronym for "presentence report"—the official name in Fed.R.Crim.P. ("Rule") 32(c)(1) and (2)—PSI is the far more common usage and is hence the one that we adopt here.

provided materially false information to a judge or magistrate.

In those respects Eicke claimed that neither his having provided agents with one but not all of his aliases nor his testifying that he had been in contact with the CIA justified an obstruction-of-justice boost. He contended that the former was an omission (as opposed to a prevarication) and that the CIA's denial of contact with him was insufficient evidence of perjury on his part.

Judge Mills rejected both defendants' arguments (as well as others), and he increased each defendant's offense level calculation by two levels for obstructing justice. At sentencing he said that Jones and Eicke were "manipulators, flimflam artists, [and] twenty-four karat frauds." He castigated both defendants for having muddied up the proceedings by setting up strawpersons for the sole purpose of knocking them down. Judge Mills then sentenced Jones to concurrent 30–month terms of imprisonment, to be followed by three years' supervised release, and he fined her $5,000. Eicke received concurrent 33–month terms of imprisonment, also followed by three years' supervised release, and he was fined $50,000. Each defendant filed a timely notice of appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

### Obstruction of Justice

■ Each defendant renews on appeal the argument that the district court erred by imposing a two-level increase under the Guidelines for obstruction of justice. In reviewing that decision we utilize a two-tiered standard of review: Factual findings are reviewed under the clearly erroneous standard, while interpretations of Guidelines requirements—whether the Guidelines require specific findings and, if so, whether the district court made those findings—receive de novo consideration (see, e.g., *United States v. Lozoya–Morales*, 931 F.2d 1216, 1218 (7th Cir.1991)).

■ Due process of course entitles a defendant to be sentenced on the basis of accurate information (*United States v. Es-*chweiler, 782 F.2d 1385, 1387 (7th Cir. 1986)). For the most part a remand for resentencing is called for where a court has rejected a timely objection and accepted inaccurate information as true, because the alternative would require our speculation as to whether the outcome would have been the same absent adoption of the improper information (see *United States ex rel. Welch v. Lane*, 738 F.2d 863, 867–68 (7th Cir.1984)).

But there is still room in our review of sentencing for the equivalent of the doctrine of harmless error in substantive criminal law. Just last year *Williams v. United States*, —— U.S. ——, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992) definitively construed the review provision of 18 U.S.C. § 3742(f)(1) as calling that doctrine into play (*id.* at ——, 112 S.Ct. at 1120–21):

> We conclude that the party challenging the sentence on appeal, although it bears the initial burden of showing that the district court relied upon an invalid factor at sentencing, does not have the additional burden of proving that the invalid factor was determinative in the sentencing decision. Rather, once the court of appeals has decided that the district court misapplied the Guidelines, a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless, *i.e.*, that the error did not affect the district court's selection of the sentence imposed.

We ourselves have (pre-*Williams*) found remand unnecessary in some situations— see, e.g., such cases as *United States v. Franklin*, 902 F.2d 501, 508–09 (7th Cir. 1990) and *United States v. Jones*, 950 F.2d 1309, 1316 (7th Cir.1991). *Williams'* message in that respect is that in order to avoid a remand we must conclude that the district court has not *relied* on the improper factor, at least not in a but-for outcome-determinative sense. If it were plain that the district judge had done so, remand would be appropriate. We therefore proceed to that inquiry here.

Guidelines § 3C1.1 calls for a two-level boost where a defendant willfully obstructs or attempts to obstruct justice during the

investigation, prosecution, or sentencing of an offense.[8] Included in the "non-exhaustive list of examples of types of conduct to which this enhancement applies" are (1) perjury, (2) providing a materially false statement to a law enforcement officer or probation officer that significantly obstructs or impedes the official investigation or prosecution and (3) providing materially false information to a probation officer in respect to a presentence investigation for the court (Guidelines § 3C1.1 Application Notes ("Notes") 3(b), 3(g) and 3(h)).[9]

■ Although we thus allow a district court to increase a sentence where the defendant has perjured himself or herself (*United States v. Grayson*, 438 U.S. 41, 54–55, 98 S.Ct. 2610, 2617–18, 57 L.Ed.2d 582 (1978))—after all, no constitutional defect looms from chilling perjury (see *United States v. Contreras*, 937 F.2d 1191, 1194–95 (7th Cir.1991))—we prohibit a district court from automatically enhancing a defendant's sentence just because a jury returned a guilty verdict after the defendant testified in his or her own defense (see *Lozoya–Morales*, 931 F.2d at 1219). Were it otherwise we would enhance the risk of chilling that constitutionally protected right (*id.*).[10] To assure ourselves that what has taken place is the first scenario rather than the second, we require that the district judge make an independent determination

that perjury occurred where that is the basis for the enlarged sentence (*id.*). But we do not demand (although we concede our preference) that the district court cite specific examples of perjury in the defendant's testimony (see *United States v. Davis*, 938 F.2d 744, 747 (7th Cir.1991)).

■ No remand is necessary in this case. Judge Mills acted properly both in specifically discounting Jones' and Eicke's testimony and in concluding that their actions justified his enhancing their sentences. Here we need not engage in idle speculation: Judge Mills' comments leave no doubt that Jones' and Eicke's sentences would have been the same had their PSIs accurately reflected the record. We deal with the defendants in turn.

As for Jones, she directs us principally to what she claims was the district court's erroneous adoption of PSI ¶ 35, from which she argues that a remand is necessary because her sentence enhancement was based in part on the district court's acceptance of the PSI's inaccurate characterization of her testimony. We disagree, though we are of course troubled by the discrepancy.

Before we turn to the error in that respect—one that we find harmless in outcome-determinative terms—we emphasize why that is so. Jones was justly sentenced because she can point to no error either in

---

**8.** As always, we apply the version of the Guidelines that is more favorable to the defendant as between the provisions in effect when the offenses were committed and those in effect at the date of sentencing. Here Guideline § 3C1.1 remained unchanged. Although the Commentary to that section has undergone some revisions over the years, its substantive content has remained unaltered. We have therefore followed the same usage as the litigants in citing to and quoting from the version effective as of November 1, 1991, immediately before the date of sentencing.

**9.** "Material" in this context refers to a "fact, statement, or information that, if believed, would tend to influence or affect the issue under determination" (*id.* Note 5).

**10.** In *United States v. Dunnigan*, 944 F.2d 178, 183–85 (4th Cir.1991), where the defendant denied guilt and knowledge of the cocaine distribution at issue, the Fourth Circuit held Guide-

lines § 3C1.1 unconstitutional when the increase in levels is based on perjury, the court reflecting a different perception of the chilling effect that occurs where an obstruction-of-justice enhancement attributable to perjury is applied reflexively. However, as the Third Circuit recently noted in *United States v. Colletti*, originally reported in the advance sheets at 977 F.2d 754, 761 (3d Cir.1992), the courts of appeals (including this one in *Contreras*) have been nearly unanimous in upholding the constitutionality of Guidelines § 3C1.1, at least where the defendant did more than merely deny guilt (parenthetically, on December 21, 1992 the reported opinion in *Colletti* was modified in one minor respect that does not affect the portion cited here—and because the case's ultimate location in the bound volume of F.2d will be different, the best available current reference to the cited portion is 1992 WL 373014, at *7). This case obviously involves substantially more than the denial of guilt, and we see no reason to depart from the result that we reached in *Contreras*.

Judge Mills' application of the Guidelines principle at issue (that is, the requirement that the district court specifically find that the defendant committed perjury, and that it not punish the defendant solely for taking the stand) or in his factual determination that Jones committed perjury (which we of course review under the clearly erroneous standard rather than de novo).

As to the first question, the record persuades us that Jones was not punished because the jury returned a guilty verdict after she had testified in her own defense. Instead Judge Mills' statements—including his comments (1) that defendants were flimflam artists who manipulated the court and (2) that they had repeatedly set up strawpersons only to knock them down in the hope of confusing the proceedings—sufficiently reflect his belief that Jones perjured herself to satisfy our requirement that district courts must specifically find that defendants obstructed justice by committing perjury.

As for the factual footing for the district court's conclusion, we have reviewed the transcript thoroughly and are strongly convinced not only that the district court's finding was not clearly erroneous but also that it was in fact entirely correct. This is not a situation for giving Jones the benefit of the doubt, as we would if this were a close call (as Guidelines § 3C1.1 Note 1 puts it, "testimony or statements should be evaluated in a light most favorable to the defendant"). Quite to the contrary, Jones made a number of incredible, uncorroborated (except by Eicke's even less credible) statements of material facts (such as her reasons for flight) that were wholly inconsistent with other evidence in this case and that were no more than "a batch of lies" (*Contreras*, 937 F.2d at 1194).

As against Jones' assertion that she jumped bond because of threats, the record reflected far more plausible evidence that she skipped town for the different and more obvious reason of avoiding the law—for example, Jones' statement to her close friend Sandra Pierce that she would rather die than go to jail, and IRS Special Agent Sue Roderick's testimony that Jones told her that she had been in the Bahamas in the course of her extended travels while in flight, but that she had left there because Cedric Bain (one of the persons assisting Jones in her flight pattern) had told her that the Government knew that she was there. As another example, Jones' testimony that one of the reasons for her not communicating with the authorities was that she did not have a phone was similarly incredible—instead the evidence affirmatively reflected that she did have a telephone at one of her residences after returning from Freeport.

There is no need to multiply the instances of Jones' false testimony, which amply justify the district judge's pejorative characterization at the time of sentencing. And the result is not changed by the judge's mistaken listing of PSI ¶ 35 as evidence of Jones' obstruction of justice. That was indeed mistaken: Jones testified not (as the PSI said) that to her own knowledge Eicke had made contact with the CIA, but rather that Eicke had *told* her he had contacted the agency—a statement that he had also made before the district judge.[11]

Before we deal with the effect (or lack of effect) of the district court's mistaken approval of such factual inaccuracies, we turn to Eicke's claims in that same area. Like Jones, Eicke objects principally to what he says are factual errors in the PSI that the district court adopted when increasing Eicke's offense level for obstruction of justice. Eicke claims that he testified that he had communicated with the CIA on fewer than the 100 occasions referred to in the PSI and that although he testified as to the

---

**11.** At oral argument before us the Assistant United States Attorney contended that no difference existed between the two statements just described in the text. Surely the AUSA, an experienced attorney with significant trial experience, could not expect us to buy that argument. While the CIA's denial of any actual contact with Eicke would have rebutted the

statement that Jones did *not* make in her testimony, it has no bearing at all on the credibility of Jones' actual testimony as to what Eicke told her. Nor is the difference between the statements overly subtle: Jones, despite her lack of formal legal training, understood the distinction and was able to alert the district court to the discrepancy.

CIA's involvement with threats, he did not testify about a murder contract out on Jones and her children. Eicke relatedly contends that the CIA's denial of contacts with him and the IRS agents' inability to uncover any evidence of those contacts are insufficient evidence of perjury to justify his enhancement. Finally, Eicke claims that his failure to provide all of his aliases does not provide an alternative justification for his obstruction-of-justice enhancement. In his view, an omission of material information differs significantly from the provision of misinformation.

In response to Eicke, the government asserts that he failed to raise the factual issues at the sentencing hearing and thereby waived them (see *United States v. Livingston*, 936 F.2d 333, 336 (7th Cir.1991)) and alternatively that any error on that score was harmless. Because the district court was clear in its belief that Eicke perjured himself and because that determination was not clearly erroneous, we conclude that even if error were committed in the adoption of erroneous facts from the PSI, that error too was harmless.

There is no doubt that Eicke, like Jones, obstructed justice by committing perjury. For example, Eicke's claim that he helped Jones flee because of threats is flatly belied by the objective evidence in the case. Instead he had told Susan Pierce early on that he would never let Jones go to jail, and had begun to seek out a haven in the Bahamas (where he and Jones later spent several months of the time that Jones was a fugitive) even *before* Jones' trial—and a fortiori before the jury's guilty verdict arrived. Other evidence disclosed that Eicke had used another accomplice, Michael Sidener, to hide Jones from the federal government rather than for any such reason as the claimed threats.

We also reject Eicke's argument that insufficient evidence supported the determination that he had not communicated with the CIA. To be sure, that would not always flow from CIA denials, because the agency might sometimes deny such contacts for security reasons. But here the synergy that flows from the coupling of (1) the CIA's denial of contacts with Eicke with (2) the IRS' and Eicke's own nonsubstantiation of those contacts well justified Judge Mills' decision to enhance Eicke's sentence for obstructing justice by concluding that Eicke had stated falsely that he had contacts with the CIA.

Finally as to Eicke, we reject his attempted distinction between material nondisclosure and material misrepresentation in connection with his deceptive withholding of all but one of the names that he had employed as aliases. Just as securities fraud may consist of either type of wilful departure from the obligation of full disclosure, so too can comparable conduct fit the Application Notes' description of "providing materially false information to a probation officer." Here the purpose of obtaining aliases is to facilitate the probation officer's ability to check the defendant's past record, and the district court properly held that omitting aliases is the functional equivalent of furnishing affirmative misinformation that frustrates the investigative process.

Though what we have said demonstrates that the record more than amply reflects accurate information to support the two-level increases for both Jones and Eicke based on each one's obstruction of justice, we would be remiss if we did not return to the district court's partial adoption of inaccurate factual findings in the PSIs. It troubles us that neither the district court nor the government paid much attention to the discrepancy between Jones' PSI ¶ 35 and the actual trial record, even though Jones alerted them to it. And the transcript evidences scarcely more attention paid to the veracity of some of the statements that the district judge adopted from Eicke's PSI.

We are well aware of the extra burden that the advent of Guidelines sentencing has brought to already busy district judges. To their preexisting responsibility for imposing fair and evenhanded sentences on criminal defendants, the Guidelines have added a demand to fit such sentences within the often arbitrary framework created by the sentencing ranges de-

creed by the Guidelines grid—while at the same time each judge must articulate just how and why that fit exists, as well as often having to explain the rationale for the particular sentence chosen by the judge.

But as with every other addition that is placed on the judicial plate by Congress, without Congress' ever conducting any impact study to see what effect the new addition will have on the total burdens of the judicial officer, the extra task must still be properly discharged. And in the case of a Guidelines sentence, that includes the need to read and become thoroughly familiar with the bulky PSI that accompanies every criminal defendant, and to resolve every factual dispute arising out of the PSI (often through an evidentiary hearing separate and apart from the criminal trial or the taking of the guilty plea).

But there is another critical player in the sentencing process who should bear a major responsibility in that respect: the prosecutor. One of the more troublesome aspects of the revised sentencing system of which the Guidelines are a part is the enhanced role of the prosecutor in shaping the sentencing alternatives, without any corresponding public understanding of that fact.[12] Power should always be accompa-

nied by responsibility for its exercise—and because that coupling is lacking for so much of the role that the prosecutor plays in the total procedure and substance of sentencing, the least that can be expected is for the prosecutor to give meaningful assistance in discharging the burden we discuss here.

 Indeed, for the added reason that the prosecutor's ethical duty is to seek the fairest rather than necessarily the most severe outcome,[13] the review of the PSI for factual inaccuracies must be perceived as a shared responsibility between the prosecutor and the district court. If that had been done by the prosecutor here, the error about which Jones and Eicke complain—though a harmless one, as we have explained—could have been avoided entirely. We remind the United States Attorneys in our Circuit of that responsibility, confident that the reminder should be enough to avoid repetition (cf. *United States v. Rodriguez–Luna*, 937 F.2d 1208, 1214 (7th Cir. 1991), where we directed the United States Attorney to ensure compliance with Fed. R.Crim.P. 32(c)(3)(D)).

## *Acceptance of Responsibility*

Jones next argues that the district court erred by failing to adjust her sentence

**12.** Thus Congress, while having imposed mandatory minimum sentences for certain offenses, has granted only the United States Attorney the largely unbridled discretion to recommend lowering that sentencing floor to reflect a defendant's cooperation in the investigation or prosecution of someone else—Congress has decreed that neither defense counsel nor the district judge may initiate that possibility of removing the bars (both literally and figuratively) under 18 U.S.C. § 3553(e). Even without a congressional mandate to do so, the Sentencing Commission has seen fit to vest the same largely unfettered power in the hands of the United States Attorney alone when it comes to recommending departures downward from the Guidelines range for comparable cooperation by a defendant (Guidelines § 5K1.1). We have used the term "largely" advisedly in each instance, because at the last Term a unanimous Supreme Court has said "that a prosecutor's discretion when exercising that power is subject to constitutional limitations that district courts can enforce" (*Wade v. United States*, —— U.S. ——, ——, 112 S.Ct. 1840, 1843, 118 L.Ed.2d 524 (1992))—a doctrine whose precise boundaries obviously remain to be marked out in future

cases. Quite apart from that, substantial criticism has emanated from responsible quarters of the decisions to vest those powers in the prosecutors alone. We mean to express no view on those policy questions here—our emphasis is rather on the point made in the text: that so long as the power remains where it is, and so long as there appears to be no corresponding level of public accountability, that really increases the duty of prosecutors to assure the responsible exercise of their discretion.

**13.** See, e.g., *Professional Responsibility: Report of the Joint Conference*, 44 A.B.A.J. 1159, 1218 (1958):

The public prosecutor cannot take as a guide for the conduct of his office the standards of an attorney appearing on behalf of an individual client.... The public prosecutor must recall that he occupies a dual role, being obligated, on the one hand, to furnish that adversary element essential to the informed decision of any controversy, but being possessed, on the other, of important governmental powers that are pledged to the accomplishment of one objective only, that of impartial justice.

downward for acceptance of responsibility. She reiterates her statement below that "[o]ne cannot have an affirmative defense and not accept responsibility." Again we disagree.

■■■ Guidelines § 3E1.1(a) provides for a reduction in the offense level "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." And Note 4 to that Guideline goes on to explain:

> Conduct resulting in an enhancement under § 3C1.1 [for obstructing justice] ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.

Only extraordinary situations permit a two-level increase under Guidelines § 3C1.1 to be effectively canceled out by a two-level decrease under Guidelines § 3E1.1,[14] for example where the defendant challenges the constitutionality of the statute underlying the charge (Guidelines § 3E1.1 Note 4). Because the sentencing court views a defendant's acceptance of responsibility from a front row seat, we give its determination great deference on review (see, e.g., *United States v. Woods*, 976 F.2d 1096, 1103 (7th Cir.1992)).

There is no warrant for allocating Jones' case to the extraordinary category of an entitlement for acceptance of responsibility despite her obstruction of justice. Rather, as our earlier discussion reflects, she perjured herself in an attempt to manipulate the proceedings and to avoid responsibility for her actions—conduct wholly inconsistent with a Guidelines § 3E1.1 adjustment. We conclude that the district court did not err in failing to grant the reduction in levels that Jones requested.

### Eicke's Fine

■■■ Eicke argues for the first time on appeal that the district court erred by imposing on him a $50,000 fine, a $100 special assessment and a $1415.56 per month cost-of-imprisonment charge. That contention need not detain us for long.

Although the sentencing Judge must consider the factors set forth in 18 U.S.C. § 3572(a)(2) and Guidelines § 5E1.2(d) and then make specific findings (*United States v. Masters*, 924 F.2d 1362, 1369 (7th Cir. 1991)),[15] the Guidelines make it clear that the defendant bears the burden of showing an inability to pay when he wants that factor taken into account (see, e.g., Guidelines § 5E1.2(f), (g); *United States v. Bradley*, 922 F.2d 1290, 1298 (6th Cir. 1991)). Here Eicke refused to provide financial data, and Judge Mills explained that he expected the fine to come out of a trust fund that inured to Eicke's benefit.

If Eicke had objected to the fine below, linking that objection with the presentation of evidence on his inability to pay, Judge Mills might perhaps have imposed a lesser fine. But Eicke failed to raise such an issue despite his ample opportunity to do so. No district court can be faulted for making a decision rationally based on the evidence presented—or for failing to guess what the import of evidence not presented might have been.

### Conclusion

We have dealt with all the material issues posed by Jones and Eicke and found them wanting. Both defendants have also raised a number of other issues of lesser import. Those matters are without merit and do not affect our decision. Jones' and Eicke's sentences are AFFIRMED.

---

14. Effective November 1, 1992 the latter provision has been modified to create the possibility of a three-level reduction for acceptance of responsibility.

15. In contrast to our position stated in *Masters*, the Fifth Circuit has held that the district court need not make specific findings when imposing Guidelines fines (*United States v. Matovsky*, 935 F.2d 719, 722 (5th Cir.1991)).