**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Adalberto RUBIO–TOPETE,**
**Defendant–Appellant.**

**No. 92–10212.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 3, 1993.

Decided June 30, 1993.

---

Donald Thomas Bergerson, San Francisco, CA, for defendant-appellant.

Rory K. Little, Martha Boersch, Asst. U.S. Attys., San Francisco, CA, for plaintiff-appellee.

Before: FARRIS, POOLE, WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

## OVERVIEW

Adalberto Rubio–Topete was convicted of conspiracy to distribute heroin in violation of 21 U.S.C. § 846 and possession of heroin with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). Rubio–Topete challenges the district court's decision to exclude the testimony of Gabriel Soto and a defense investigator. He also contends that a two-level upward adjustment in his offense level for obstruction of justice based on his trial testimony violates the Constitution and is not supported by sufficient factual findings. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm Rubio–Topete's conviction, vacate his sentence, and remand for resentencing.

## FACTS

Gabriel Soto informed the San Mateo County Narcotics Task Force that a drug deal would occur on August 17, 1992. Soto told officers that Alfredo Becerra would arrive at a Redwood City parking lot in a red car and that Becerra would be accompanied by a yellow Chrysler Cordoba that would be the "load" car. Early on the morning of August 17th, officers began surveillance of the parking lot.

As anticipated, a red car accompanied by a yellow Chrysler Cordoba entered the lot that morning. The driver of the red car was believed to be Alfredo Becerra, and the driver of the Cordoba was Rubio–Topete. Officers observed that Rubio–Topete was wearing a baseball cap and a hip length olive-green army jacket. Becerra and Rubio–Topete met and spoke with two other individuals, later identified as codefendant Martin Alvarez and an individual known only as "El Chamaco." After a brief discussion with the driver of the red car, Martin Alvarez exited his vehicle and got in the passenger side of the Cordoba. El Chamaco remained in the white Nissan in which he had arrived. After a few minutes, the cars left the parking lot. The white Nissan and the Cordoba headed in the same direction while the red car left in another direction.

Officers followed the Nissan and the Cordoba from both the ground and the air. The cars proceeded south on highway 101, eventually arriving at a San Jose house at about 9:45 a.m. Soto had told police that a San Jose house was the stash house for Mr. Becerra's drug operation.

After arriving at the San Jose house, police continued surveillance from a van and also from the air. From their vantage point on the ground, officers could not see all of the house (their view of the corner of the house where the garage was located was obstructed), but they could see most of the house, the driveway, and the surrounding area. Officers maintained watch throughout the day and testified that Rubio–Topete never left the house until after 7:00 p.m.

According to the testimony, at about 7:00 p.m. Alvarez came out of the house and moved the yellow Cordoba, which had been parked on the street all day, into the driveway. Alvarez then went back into the garage. Officers testified that a few minutes later Rubio–Topete came out of the garage and got into the back seat of the car for about five minutes. He then got out and went back into the garage area. A few minutes later, both Alvarez and Rubio–Topete came out of the garage area and got into the back seat of the Cordoba for a few minutes. Both returned to the garage area for less than a minute, and when they came back out Alvarez was carrying a box. Both men approached the passenger side of the car, and Rubio–Topete got into the car. Alvarez stood close to the Cordoba next to the opened passenger door and held the box up next to the door. After about five minutes, Alvarez discarded the empty box, Rubio–Topete got out of the car, and both of them returned to the garage area.

A few minutes later both men got into the car and drove away. Rubio–Topete drove, heading north on highway 101. He returned to the same parking lot in Redwood City where surveillance had begun, and officers stopped the car and ordered both men out. Two police narcotics dogs sniff-searched the vehicle and alerted to the rear edge of the exterior passenger door.

An officer got into the car and removed the paneling from the right rear sidewall, using a Phillips screwdriver that he found on the rear floor of the car. Inside the metal structure of the rear sidewall, officers discovered twelve plastic bags containing about 15 pounds of heroin. Police then searched Rubio–Topete and discovered a box containing a small digital scale commonly used to weigh narcotics and a piece of paper with a column of numbers corresponding exactly to the number of bags and the number of ounces of heroin in each bag.

Rubio–Topete's only defense at trial was his contention that he did not know that the car he was driving contained heroin. He testified that he borrowed the Cordoba from Becerra to look for a transmission for a '69 Ford pick-up. He said he did not want to use his own car because it had a smaller trunk and because he did not want to soil the carpet in his trunk. He claims that he took Alvarez to San Jose because Alvarez said he needed a ride to a party there. He also testified that Becerra told him that El Chamaco would help him find a transmission once they arrived in San Jose.

Rubio–Topete testified that he left with El Chamaco in the Nissan to look for a transmission an hour or two after arriving at the house in San Jose. Officers testified that they saw the Nissan leave but indicated that they never saw Rubio–Topete leave the residence. Rubio–Topete testified that he and El Chamaco went to look for the transmission. Interestingly, Rubio–Topete testified that he had no money on his person with which to purchase the transmission. When he was asked how he was going to pay for the transmission if he found one, he indicated that El Chamaco, whom he allegedly did not know, was going to pay for it. Rubio–Topete also denied knowing any of the people at the house where the barbecue was held, though he remained there for most of the day. He did admit that he was acquainted with Alvarez.

Finally, Rubio–Topete testified that there was another man at the barbecue in a baseball cap and olive-green jacket. He claims that he saw this man coming and going from the garage, raising the inference that this

other man must have been the one police observed in the back seat of the car he was driving. (The officer in the van identified Rubio–Topete as the person he had seen in the back seat of the car). Rubio–Topete also testified that the piece of paper and the box containing the digital scale were given to him at the house. He said that he was told to deliver them to Mr. Becerra and testified that he did not know what they were.

## DISCUSSION

### I. Exclusion of Soto's Testimony

■ Rubio–Topete contends that the district court erred when it excluded the testimony of Gabriel Soto because the testimony was irrelevant and privileged under the Fifth Amendment. We review a district court's ruling on the relevance of evidence for an abuse of discretion, *United States v. Schaff,* 948 F.2d 501, 505 (9th Cir.1991), and Soto's claim of privilege de novo. *United States v. McConney,* 728 F.2d 1195, 1202 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

■ The privilege against self-incrimination extends not only to "answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the [witness]." *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). The standard for determining whether a claim of privilege is justified is " 'whether the claimant is confronted by substantial and "real," and not merely trifling or imaginary, hazards of incrimination.' " *United States v. Apfelbaum,* 445 U.S. 115, 128, 100 S.Ct. 948, 956, 63 L.Ed.2d 250 (1980) (citations omitted); *United States v. Paris,* 827 F.2d 395, 398 (9th Cir.1987).

■ Rubio–Topete hoped to elicit two lines of testimony from Soto. First, he planned to ask Soto about the extent of his involvement in and knowledge of Becerra's drug operation. Through this testimony he hoped to establish that Soto knew the operation in depth and that Soto was not acquainted with Rubio–Topete. Second, Rubio–Topete wanted to question Soto about the events of August 17th, focusing in particular on whether Rubio–Topete's participation was anticipated. Rubio–Topete contends that Soto's testimony would have bolstered his defense that he was an unsuspecting mule. We conclude, however, that the first line of testimony is privileged and the second irrelevant.

It is uncontested that Soto received no grant of immunity from the government. Any questions, then, about Soto's knowledge of Becerra's drug operation and his past dealings with Becerra could have provided a link in the chain of evidence needed to prosecute Soto and certainly posed a real hazard of incrimination. Thus, Soto's claim of privilege was valid at least as it pertains to any past dealings with or knowledge of Becerra's drug operation. *See Apfelbaum,* 445 U.S. at 128, 100 S.Ct. at 956; *Paris,* 827 F.2d at 398.

■ As for the testimony that Rubio–Topete sought relative to Soto's knowledge of the August 17th transaction, we agree with the district court that such testimony was irrelevant. It was unclear exactly what role Soto played in setting up the August 17th deal. All that can be said for certain is that Soto provided police with important information concerning the events that would transpire on that day. The district court observed that Soto did not witness any of the events in question and concluded, after an in camera hearing, that he could provide no testimony relevant to the question of whether Rubio–Topete knew the heroin was in the car.

■ Perhaps, Soto's testimony about what he thought would happen that day would have some probative value given a proper foundation, i.e., his knowledge of Becerra's operation. However, Rubio–Topete could not establish a proper foundation because any information relating to Soto's knowledge of Becerra's operation was privileged. Given the highly speculative nature of any testimony Soto could have offered concerning Rubio–Topete's knowledge that there was heroin in the car, we conclude that the district court did not abuse its discretion by excluding the evidence.

## II. Exclusion of the Defense Investigator's Testimony

■ As an alternative to eliciting the desired testimony directly from Soto, Rubio–Topete proposed to call a defense investigator to whom Soto had allegedly made certain statements. Rubio–Topete challenges the district court's determination that these statements were irrelevant and did not meet the standards of Federal Rule of Evidence 804(b)(3). A district court's ruling on the relevance of evidence and its determination as to whether a statement is admissible under Rule 804(b)(3) are reviewed for an abuse of discretion. *Schaff,* 948 F.2d at 505; *United States v. Ospina,* 739 F.2d 448, 452 (9th Cir.), *cert. denied,* 469 U.S. 887, 105 S.Ct. 262, 83 L.Ed.2d 198 (1984), *and cert. denied,* 471 U.S. 1126, 105 S.Ct. 2658, 86 L.Ed.2d 274 (1985).

■ Soto's statements to the defense investigator were hearsay. Nonetheless, Rubio–Topete argues that the statements were admissible as declarations against interest under rule 804(b)(3). To determine if a statement qualifies as a declaration against interest, we must decide whether the statement "so far tended to subject the declarant to ... criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." *United States v. Nazemian,* 948 F.2d 522, 530 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992) (quoting Fed.R.Evid. 804(b)(3)). Moreover, when such a hearsay statement is offered to exculpate a criminal defendant, there must be "corroborating circumstances which indicate the trustworthiness of the statement." *Id.* Soto's statements to the defense investigator do not meet these standards.

While it is not clear exactly what Soto said to the defense investigator, Rubio–Topete indicated that he sought to have the investigator testify that Soto had told him that he did not know Rubio–Topete, that he had never known him to be involved previously as a drug courier for Becerra, and that he did not know that he would participate in the August 17th transaction. Rubio–Topete never indicated or made an offer of proof that the defense investigator knew or would testify about Soto's connection with Becerra's drug operation. Rubio–Topete indicated only that the defense investigator would testify about Soto's relationship with Rubio–Topete. However, statements about Soto's relationship with Rubio–Topete simply do not tend to subject Soto to criminal liability. Moreover, Rubio–Topete can point to no corroborating circumstances indicating the trustworthiness of the exculpatory statements. *See Nazemian,* 948 F.2d at 530.

■ In addition, it is clear that the defense investigator's testimony was irrelevant. As with the direct testimony of Gabriel Soto, Rubio–Topete could not establish a proper foundation for admitting the defense investigator's testimony. Thus, anything Soto said about his relationship with Rubio–Topete had no probative value relative to Rubio–Topete's knowledge that the heroin was in the car. Accordingly, we conclude that the district court did not abuse its discretion by refusing to admit the statements in evidence.

## III. Rubio–Topete's Due Process Challenge

■ Rubio–Topete contends that the exclusion of Soto's and the defense investigator's testimony violated his due process right to a fair opportunity to defend against the state's accusations. Rubio–Topete cites *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d (1967), and *United States v. Whitman,* 771 F.2d 1348 (9th Cir.1985), as dispositive in this regard. Although those cases stand for the proposition that the exclusion of evidence can amount to a denial of due process, they are inapposite here.

First, unlike this case, *Chambers* and *Washington* involved the exclusion of evidence, under old state evidentiary statutes, that would have been admissible in most states. *See Chambers,* 410 U.S. at 295–303, 93 S.Ct. at 1045–50; *Washington,* 388 U.S. at 20–23, 87 S.Ct. at 1923–25. Second, in both cases the Supreme Court concluded that the excluded evidence was of such import that the defendants had been deprived of a fair trial. In *Chambers,* the Court stated that

the excluded evidence had made the defense "far less persuasive than it might have been." 410 U.S. at 294, 93 S.Ct. 1038. In contrast, the evidence excluded here was marginally relevant, at best, and highly speculative. In addition, the *Washington* court expressly stated that its opinion did not apply to situations involving legitimate claims to the privilege against self-incrimination. 388 U.S. at 23 n. 21, 87 S.Ct. at 1925 n. 21. Finally, in *Whitman* this court concluded that the district court had erred by excluding the evidence. 771 F.2d at 1351. Here, however, we are convinced that no error was committed. We conclude, therefore, that the excluded testimony could have added little, if anything, to Rubio–Topete's defense and that its exclusion did not deprive him of a fair trial. *See Chambers,* 410 U.S. at 294, 93 S.Ct. at 1045; *United States v. Slaughter,* 891 F.2d 691, 698 (9th Cir.1989), *appeal after remand,* 956 F.2d 276, *cert. denied,* —— U.S. ——, 112 S.Ct. 3053, 120 L.Ed.2d 919 (1992); *United States v. Benveniste,* 564 F.2d 335, 342 (9th Cir. 1977). Thus, we hold that Rubio–Topete was not deprived of his due process rights.

### IV. Challenges to the Upward Adjustment of Rubio–Topete's Sentence for Obstruction of Justice

 Rubio–Topete contends that an obstruction of justice adjustment based on perjured testimony at trial violates the Constitution because of the chilling effect that it has on an accused's right to testify. He also maintains that the scheme for adjusting the offense level for obstructing justice is irrational and violative of the Equal Protection component of the Due Process Clause of the Fifth Amendment. We review constitutional challenges to the application of the Sentencing Guidelines de novo. *United States v. Barbosa,* 906 F.2d 1366, 1369 (9th Cir.), *cert. denied,* 498 U.S. 961, 111 S.Ct. 394, 112 L.Ed.2d 403 (1990).

 This court has already rejected Rubio–Topete's argument that an upward adjustment for obstruction of justice based on perjury violates the Constitution. *Id.* at 1370 ("This court has ... consistently recognized the propriety of a sentencing court's enhancing a sentence because of false testimony by a defendant."). Moreover, the Supreme Court has recently reaffirmed the constitutionality of this practice. In *United States v. Dunnigan,* —— U.S. ——, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), the Court held that enhancing a sentence under § 3C1.1 of the Guidelines based on perjured testimony "is consistent with [its] precedents and is not in contravention of the privilege of the accused to testify in her own behalf." *Id.* —— U.S. ——, 113 S.Ct. at 1119; *see also United States v. Grayson,* 438 U.S. 41, 54, 98 S.Ct. 2610, 2617, 57 L.Ed.2d 582 (1978) ("any chilling effect on a defendant's decision to testify falsely, ... is entirely permissible. There is no protected right to commit perjury."). Thus, we reaffirm this court's opinion in *Barbosa* and reject Rubio–Topete's argument.

 Rubio–Topete's other constitutional challenge is much more creative than the first but no more compelling. He challenges the fact that a two point adjustment for obstruction of justice will increase the sentence of a criminal with a high base offense level more than it will increase the sentence of a criminal with a low base offense level.[1] Rubio–Topete's complaint is that the enhancement "carr[ies] greater sting for defendants" with higher base offense levels. *United States v. Contreras,* 937 F.2d 1191, 1195 (7th Cir.1991). He argues that such "disproportionate punishment across cases for the same conduct" is irrational and violative of the Equal Protection component of the Fifth Amendment. *Id.*

The Supreme Court has indicated the possibility that a constitutional objection under equal protection criteria could be raised

---

1. For example, assume two criminals in Category I of the Criminal history category and base offense levels of 12 (criminal A) and 32 (criminal B) respectively. A two-level upward adjustment in criminal A's base offense level will change his sentencing range from 10–16 months to 15–21 months. A two-level adjustment for criminal B on the other hand changes his guideline range from 121–151 months to 151–188 months. Criminal B runs the risk of an additional 37 months of punishment based on the adjustment (the difference between the maximum sentence before the adjustment and the maximum after the adjustment) while criminal A only runs the risk of an additional 5 months of punishment for the same conduct.

when the punishment bears no relation whatever to the crime. *See McCleskey v. Kemp*, 481 U.S. 279, 306–08, 107 S.Ct. 1756, 1774–75, 95 L.Ed.2d 262 (1987). However, the punishment under the obstruction of justice adjustment scheme bears considerable relation to the crime. As the *Contreras* Court noted:

> Even examining the disparate impact across cases of adjustments such as § 3C1.1, we find no constitutional infirmities. . . . [T]he real cost of perjury depends upon the severity of the crime out of which a defendant is trying to lie his way. . . . As a constitutional proposition . . . the scheme adopted by the Guidelines passes muster.

*Contreras*, 937 F.2d at 1196. Indeed, it seems entirely rational to punish perjury more severely when the underlying crime out of which the defendant is trying to lie his way is more serious. Certainly such a scheme is rational for purposes of constitutional review, *see Contreras*, 937 F.2d at 1195–96; *cf. Chapman v. United States*, —— U.S. ——, —— – ——, 111 S.Ct. 1919, 1926–29, 114 L.Ed.2d 524 (1991), and we reject Rubio–Topete's argument to the contrary.

 Rubio–Topete also challenges the sufficiency of the findings supporting the upward adjustment based on his trial testimony. Recently, the Supreme Court has indicated that "if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition" outlined by the Court. *Dunnigan*, —— U.S. at ——, 113 S.Ct. at 1117. While the Court encouraged district courts to "address each element of the alleged perjury in a separate and clear finding", it held that a finding would be sufficient if it makes a "finding of obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury." *Id.*

Here, the district court found that Rubio–Topete's "behavior [and] his testimony . . . indicate that the obstruction of justice finding is appropriate." The district court also stated that the testimony on behalf of the defense was "inaccurate." While these findings seem to suggest that the district court believed Rubio–Topete had committed perjury at trial, we cannot escape the conclusion that these findings are insufficient. The district court has not made factual findings encompassing all of the factual predicates necessary for a finding of perjury.[2] Accordingly, we vacate Rubio–Topete's sentence and remand for resentencing.

AFFIRMED in part, VACATED in part, and REMANDED.

---

2. The Supreme Court has indicated that perjury requires (1) the giving of false testimony, (2) concerning a material matter, (3) with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory. *Dunnigan*, —— U.S. at ——, 113 S.Ct. at 1116 (citing 18 U.S.C. § 1621(1)).