**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Thomas F. STOCKHEIMER,
Defendant-Appellant.**

**No. 86–1300.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 30, 1986.

Decided Dec. 5, 1986.

Steven M. Epstein, Milwaukee, Wis., for defendant-appellant.

Patricia J. Gorence, Joseph P. Stadtmueller, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before CUDAHY and COFFEY, Circuit Judges, and PELL, Senior Circuit Judge.

PELL, Senior Circuit Judge.

Thomas Stockheimer is serving a two year prison sentence for his conviction, after trial by jury, for the knowing and willful receipt and possession of a firearm by a felon in violation of 18 U.S.C.App. § 1202(a)(1). Stockheimer appeals his conviction, contending that the district court erred in denying his motion to suppress evidence obtained during a search conducted without adherence to the requirements of Fed.R.Crim.P. 41(d). Stockheimer also argues that the evidence was insufficient to support his conviction.

## I. FACTS

At about 4:00 p.m. on January 11, 1980, Clark County officials were executing a search warrant at a mobile home in Tigerton, Wisconsin, which was believed to be the residence of Thomas Stockheimer. During the search, agents from the Bureau of Alcohol, Tobacco & Firearms (ATF) were parked on a county road outside the property where the mobile home was located. The ATF agents were interested in the search because they had suspected that there were firearms in the mobile home. Their suspicions stemmed from an interview with Mike Stamler, a newspaper reporter who told them that he had seen the firearms on the premises several months earlier. While they were waiting, the ATF agents received a call from one of the Clark County officials requesting assistance in the execution of the state search warrant. The ATF agents responded by driving up to the mobile home where the search was being conducted. One of the agents knocked on the door, and was informed by the officials inside that everything was under control and their assistance was no longer required. The agent was also told at that time that firearms were indeed inside the mobile home.

When the ATF agents then attempted to leave the property, they were prevented from doing so by two vehicles which drove onto the road blocking their only exit. Approximately ten to twelve people, with guns drawn, got out of the two vehicles and strung a wire cable across the road. One person, who identified himself as James Wickstrom, questioned the agents about their identities and their purpose and authorization for being on the property. The agents identified themselves and requested that they be allowed to leave. Their request was denied, however, and the cars and the wire cable continued to prevent their exit.

The trapped agents then radioed to other ATF agents, who were located in vehicles outside the property, and instructed them to contact another agent who was stationed at a phone booth in Tigerton, Wisconsin. They wanted to inform that agent that Clark County officials had observed several guns inside the mobile home. The agent was also instructed to describe the situation to the ATF office in St. Paul, Minnesota and to request assistance from the Wisconsin State Highway Patrol, due to the potentially volatile and threatening circumstances.

The agents were detained on the property for approximately one hour, while it began to grow darker and to snow heavily. The agents spoke with Wickstrom several more times and unsuccessfully renewed their request to leave the property.

While still detained on the property, the agents were informed by radio that United States Magistrate Aaron E. Goodstein, in Milwaukee, Wisconsin, had issued a search warrant for the white mobile home located behind the white frame house off of Highway M in the Tigerton, Wisconsin area. The area is approximately a three and one-half to four hour drive from Milwaukee, Wisconsin. The agents' previous investigation had revealed that Thomas Stockheimer occupied the mobile home and they had identified the mobile home from aerial photographs of the area. The agents were specifically informed by radio of the description of the premises to be searched and the items to be seized as authorized by the warrant.

Upon being advised of the search warrant and its scope, the agents entered the mobile home and identified themselves to Kathryn Stockheimer and James Wickstrom, the occupants of the mobile home at the time. The agents informed them that Magistrate Goodstein had issued a federal search warrant for the mobile home and they described the items authorized to be seized, pursuant to that warrant. Since the ATF agents had no warrant in hand, a copy of the warrant was not left at the trailer. The agents seized nine firearms and other items during the search and specifically identified these in an unsigned inventory which they left with Kathryn Stockheimer upon the completion of the search. By the time the search was complete, members of the Wisconsin State Patrol had arrived and stationed themselves outside the mobile home with lights flashing. The ATF agents were therefore able to leave the property with the seized firearms in their custody.

On January 14, 1980, one of the agents filed a return of the search warrant with Magistrate Goodstein, swearing that a copy of the search warrant and a receipt for the items seized had been left with Kathryn Stockheimer. An unsuccessful attempt had been made to deliver a copy of the search warrant to Thomas Stockheimer, Route 2, Tigerton, Wisconsin via certified mail. The mail was returned unopened on January 16, 1980, however, with a notation from the post office that the addressee refused to accept the letter.

The mobile home from which the guns were seized is registered in the name of the Life Science Church where Kathryn Stockheimer is a pastor. The defendant maintains that he did not reside in the mobile home.

On January 13, 1981, a federal grand jury returned a one-count indictment against Stockheimer for possession of a firearm by a felon. Stockheimer was arrested on August 30, 1985. Shortly after his arrest, Stockheimer moved to suppress the introduction of the nine firearms seized during the search on January 11, 1980 as evidence. Magistrate Bittner recommended granting the motion, finding that the "failure of the searching officers to [display the search warrant upon entering the mobile home] was constitutionally significant" and required suppression. The district court rejected the recommendation, however, and denied the motion to suppress. In doing so, the court stated that to allow suppression in this case would improperly "elevate the ministerial functions of Rule 41(d) to constitutional proportions" since neither prejudice nor intentional and deliberate disregard of the law had been established by Stockheimer.

At trial, the parties stipulated that Stockheimer was a convicted felon and that the seized firearms had travelled in interstate commerce. Whether Stockheimer possessed a firearm, however, was in dispute. In order to show Stockheimer's possession, the Government presented evidence to show that the mobile home where the firearms were seized was Stockheimer's residence. To show that Stockheimer resided there, the Government presented several witnesses who testified that they had met Stockheimer at the mobile home during the months surrounding January 1980.

The Government's first witness, George Snow, testified that between the fall of 1979 and the spring of 1980, he picked up Stockheimer at the mobile home and drove him to meetings and seminars around the state. He testified that he had done this about 15 to 20 times, and that often he had gone inside the mobile home to help Stockheimer carry his papers to the car. Following each of these excursions, Snow testified that he dropped Stockheimer off at the same mobile home where he had picked him up, often late at night. Snow further testified that on one occasion in January 1980, he picked up Stockheimer at the mobile home during a heavy snowstorm. He said that he remembered this particular day because the following morning, Stockheimer had called him with news that the mobile home had been searched while they were out.

Another Government witness, Dallas Nelson, testified that he met with Stockheimer several times in the same mobile home to discuss some traffic tickets. George Kann testified for the Government that he sold the mobile home to Stockheimer's sister Kathryn, and that Stockheimer had informed him that he would be living in the home. A newspaper reporter, Michael Stamler, testified that he interviewed Stockheimer outside the mobile home in October 1979. Stamler testified that, after about forty-five minutes, Stockheimer invited him inside the mobile home. Once inside, Stamler noticed five long guns hanging on a rack. Stamler further testified that, a day or so after the search, he reached Stockheimer by telephoning him at 715-535-2407. That telephone number was registered to Kathryn Stockheimer and her address was listed as Route 2, Box 287A, Tigerton, Wisconsin.

Route 2, Box 287A, Tigerton, Wisconsin was the post office box for the mobile home in which the firearms were seized. The Government introduced records from the Veteran's Administration which listed Thomas Stockheimer's address as Route 2, Box 287A, Tigerton, Wisconsin. In addition, their records contained a signed letter from Stockheimer requesting the Veteran's Administration to record this as his permanent address. Both the United States Postal Service and the Shawano County Department of Health & Social Services also had records indicating that Stockheimer's address during January 1980 was Route 2, Box 287A, Tigerton, Wisconsin. Agent Knapp, a Government witness, testified that he had seen correspondence addressed to Stockheimer while he was in the mobile home. James Wickstrom, a pastor at the Life Science Church and a witness for Stockheimer, admitted seeing Stockheimer's personal correspondence in the mobile home as well.

Stockheimer attempted to show that the mobile home was not his residence. Although he did not personally testify, Stockheimer called Kathryn Stockheimer and Wickstrom to testify that the mobile home was merely used as a church office. Both admitted that the defendant slept there on occasion at Kathryn's request, but explained that this was done so that Kathryn could keep an eye on him for medical reasons. Aside from those times, however, neither witness could say for certain where the defendant did reside, if not at the mobile home in question.

At the close of all of the evidence, the court instructed the jury regarding both actual and constructive possession. Following deliberations, the jury returned a guilty verdict and the court subsequently sentenced Stockheimer to a maximum of two years in prison. Stockheimer appeals claiming that (1) the Government's failure to abide by the requirements of Fed.R.Crim.P. 41(d) resulted in a violation of his rights under the Fourth Amendment, thereby requiring suppression of the seized firearms, and (2) that there was insufficient evidence to convict him of knowingly receiving and possessing firearms.

## II. *DISCUSSION*

### A. *Fed.R.Crim.P. 41(d).*

Rule 41(d) requires that:

The officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken.

Failure to comply with these procedural requirements has generally been held not to amount to a deprivation of Fourth Amendment rights necessitating suppression. *See, e.g., United States v. Harrington,* 504 F.2d 130, 134 (7th Cir.1974); *United States v. Dudek,* 530 F.2d 684, 688 (6th Cir.1976); *United States v. Marx,* 635 F.2d 436, 441 (5th Cir.1981). A violation of Rule 41(d) may lead to exclusion, however, where there is a showing of "prejudice" or "intentional and deliberate disregard" of the rule. *See United States v. Mendel,* 578 F.2d 668, 673 (7th Cir.1978); *United States v. Burke,* 517 F.2d 377, 386-87 (2d Cir.1975). Stockheimer has shown neither.

Stockheimer attempts to rely on *Burke,* 517 F.2d at 386–87, to show prejudice, claiming that the search would have been less abrasive had the agents had a copy of the warrant with them. To support his claim, Stockheimer describes a "scuffle" between his sister and an agent that ensued when the agent allegedly refused to show Kathryn a search warrant. The portion of the record to which Stockheimer refers us, however, is a description by Kathryn of a "scuffle" which occurred during the earlier search by the county officials. Interestingly, the county officials did present a copy of a valid search warrant and yet a problem still arose. We are not persuaded that producing a copy of the federal warrant prior to the second search would have changed Kathryn Stockheimer's attitude. Moreover, it is unclear from the record whether an altercation even occurred during the federal search.

Stockheimer has also failed to show that the agents' failure to comply with what we regard as ministerial requirements of Rule 41(d) was either intentional or deliberate. On the contrary, the agents for the most part properly executed a reasonable search. They obtained a valid search warrant from a neutral and detached magistrate upon a sworn affidavit establishing probable cause. Upon entering the mobile home, the agents immediately informed the occupants that they had obtained a telephone search warrant and explained to them the scope of that warrant. Prior to their departure, the agents prepared a detailed inventory of the items seized and left a copy of this with Kathryn. In the days following the search, the agents attempted to deliver a copy of the warrant to the defendant by certified mail. The copy was returned to the agents on January 16, 1980 (five days after the search), with a notation that the addressee had refused to accept delivery. Under these circumstances, we hold that the agents satisfied the spirit of Rule 41(d). *See United States v. Harrington,* 504 F.2d 130, 134 (7th Cir.1974). We do not rest our decision, as the Government urges us to do, on existing exigent circumstances, nevertheless we cannot ignore the fact that the unusually peculiar conditions of weather, distance, and confinement were circumstances reflecting upon whether the agents intentionally and deliberately disregarded Rule 41(d).

Stockheimer claims that the inventory was insufficient because it was unsigned, that the agent misrepresented on the return of the warrant that he had left a copy with Kathryn Stockheimer, and that now, six years later, he has yet to receive a copy of the warrant. These factors, Stockheimer argues, show the agents' bad faith in violating Rule 41(d). These violations, which we regard as ministerial, do not, in our opinion, require the suppression of evidence in this case. Although Government agents are expected to comply with the rule's requirements, including the requirement that a copy of the warrant must be delivered to the occupant of the searched premises, the motion to suppress was properly denied here since "the warrant satisfies constitutional requirements and does not contravene any substantial policy in Rule 41 designed to protect the integrity of the federal courts or to govern the conduct of federal officers." *Id.* at 134.

### B. *Sufficiency of Evidence.*

■ In reviewing insufficiency of evidence claims, "[t]his Court must review the evidence in the light most favorable to the government to determine whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Reynolds,* 801 F.2d 952, 953–954 (7th Cir. 1986) (*quoting Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). It follows from this test that, "when the factfinder is asked to draw conflicting inferences from the facts in evidence in order to choose between conflicting hypotheses, the reasonable doubt test requires the reviewing court to consider the evidence according to the prosecution's inferences." *United States v. Moya,* 721 F.2d 606, 610 (7th Cir.1983), *cert. denied,* 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984).

Stockheimer argues that the evidence was insufficient to convict him of receiving a firearm by a felon. He claims that proof of receipt requires more than mere proof of possession. The Supreme Court recently stated that "proof of illegal receipt of a firearm *necessarily* includes proof of illegal possession of that weapon. '[W]hen received, a firearm is necessarily possessed.'" *Ball v. United States,* 470 U.S. 856, 105 S.Ct. 1668, 1672, 84 L.Ed.2d 740 (1985). *See United States v. Martin,* 732 F.2d 591, 592 (7th Cir.1984). Because Stockheimer possessed a firearm which he did not manufacture, he necessarily received it. *See Ball,* 105 S.Ct. at 1672 n. 9.

Stockheimer does not argue that there was insufficient evidence to convict him of possessing a firearm. Four Government witnesses testified that, on the occasions in which they dealt with Stockheimer, they did so in or around the same mobile home where the firearms were seized. The Government also presented records from several agencies which indicated that the defendant's address was Route 2, Box 287A, Tigerton, Wisconsin; the box number assigned to the mobile home in which the firearms were found.

Although Stockheimer presented two of his own witnesses to contradict the Government's evidence, the jury was free to believe the version of events which they found credible. In any case, to some extent Stockheimer's witnesses helped to corroborate the testimony of the Government's witnesses. On cross-examination, both of Stockheimer's witnesses admitted that Stockheimer sometimes slept in the mobile home and that he kept clothing and other personal belongings there. Kathryn acknowledged that Stockheimer had a key to the mobile home and could come and go as he pleased. While the two witnesses maintained that the mobile home was not Stockheimer's permanent residence, neither witness could say for certain where Stockheimer did permanently reside. In sum, there was sufficient evidence to find that Stockheimer resided in the mobile home. Since the mobile home was his residence, he was able to assert control over the firearms. Stockheimer therefore possessed, and necessarily received, the firearms.

■ Stockheimer also argues that the court failed clearly to differentiate between actual and constructive possession in its instruction to the jury. At the close of trial, the court instructed the jury that:

The law recognizes two kinds of possession, actual possession and constructive possession.

A person who knowingly has direct physical control over a thing at a given time is then in actual possession of it.

A person, who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.

The law recognizes, also, that possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons have possession of a thing, possession is joint.

This instruction properly distinguishes between actual and constructive possession, *see, e.g., United States v. Herrera,* 757 F.2d 144, 150 (7th Cir.1985), and it was for the jury to decide whether possession, in whatever form, had been proven beyond a reasonable doubt.

Finally, Stockheimer asserts that the Government "utterly failed to prove that [he] was anywhere near the trailer or guns on the date alleged, January 11, 1980." The Government did, however, present a witness who testified that he picked up Stockheimer at that mobile home on a snowy day in January 1980 and that the following day Stockheimer called to tell him that the mobile home had been raided. Stockheimer's counsel attempted to impeach the witness with a prior inconsistent statement, but the jury chose to believe the version presented by the witness at trial. The Government also presented the testimony of a newspaper reporter who claimed to have telephoned and spoken with Stock-

heimer at the mobile home several days after the search. The testimony of these two witnesses was sufficient to establish that Stockheimer was residing at the mobile home on January 11, 1980.

### III. *CONCLUSION*

For the reasons discussed above, Stockheimer's conviction is affirmed.