pire Wood at the critical time and, if so, how much they owe.

REVERSED.

**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Efren ROMERO and Raphael Lara–**
**Aceves, Defendants–Appellants.**

Nos. 94–2299, 94–3473.

United States Court of Appeals,
Seventh Circuit.

Argued May 9, 1995.

Decided June 15, 1995.

Jonathan C. Bunge, Joshua Buchman (argued), Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for U.S. in No. 94–2299.

Michael B. Mann (argued), Zavislak & Mann, Oakbrook, IL, for Efran Romero.

Barry Rand Elden, Asst. U.S. Atty., Joshua Buchman (argued), Office of U.S. Atty.,

Crim. Receiving, Appellate Div., Chicago, IL, for U.S. in No. 94–3473.

Dean P. Karlos (argued), Chicago, IL, for Rafael Lara–Aceves.

Before ESCHBACH, FLAUM, and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Defendants Efren Romero and Raphael Lara–Aceves were convicted of conspiring to possess with the intent to distribute and attempting to possess with intent to distribute three kilograms of cocaine. In this joint appeal, both men challenge their convictions for sufficiency of the evidence. Additionally, Romero disputes an evidentiary ruling and a jury instruction, while Lara separately contests a sentencing enhancement he received for obstruction of justice. We now affirm.

### I.

The story of this case begins in January, 1993, when Sergio Garcia, a cooperating individual working with the Drug Enforcement Administration ("DEA"), started communicating on a regular basis with Miguel Cassimoro. Garcia posed as a potential cocaine seller, and Cassimoro offered to locate buyers for Garcia.

On March 21, 1993, Cassimoro paged Garcia. Garcia called Cassimoro, and Cassimoro informed Garcia that he had found buyers for him. Cassimoro then put defendant Romero on the telephone, and Romero expressed an interest in purchasing cocaine. Romero also indicated that he knew others who would be interested.

The next day, Garcia and an undercover drug agent from the Northeast Metropolitan Enforcement Group ("NMEG") met Cassimoro. After talking with Garcia and the NMEG agent, Cassimoro took them to the basement apartment of Jorge Castellanos, where the three talked with Romero about a cocaine sale. Romero told the agent that his buyers had money for the drugs and were ready to proceed with the deal. Romero, Garcia, and the agent then drove around the north side of Chicago, unsuccessfully looking for the buyer.

Cassimoro again paged Garcia on March 23, 1993. When Garcia responded to the page, Cassimoro informed him that Romero wanted three kilograms of cocaine. Cassimoro then put Romero on the telephone, at which time Romero asked Garcia to call him "Primo" and the two agreed to deal directly with one another. Later that same day, Romero and Garcia spoke again and agreed to meet at a gas station. Garcia and another NMEG agent went to the gas station and met with Romero. The agent showed Romero a fake kilogram of cocaine, and Romero attempted to contact buyers, again without success. Another deal fell through on March 24. Garcia and Romero had spoken on the phone, and Romero had said that he had a buyer. Garcia and Romero, along with another NMEG agent, met the buyer in north Chicago. The deal collapsed, however, when the agent refused to deliver the cocaine prior to receiving any money.

On March 29, 1993, Romero contacted Garcia once more and told him about still another buyer. They agreed to speak the next day. On March 30, 1993, Romero and Garcia had a number of telephone conversations, during which Romero told Garcia that his buyers wanted to acquire "three pairs of boots"—understood to mean three kilograms of cocaine—and that the deal should occur the following day. Romero indicated that he would not be present at the transaction because he had to work, but he asked Garcia to meet him after the drug sale so that he could collect his broker's commission.

On March 31, 1993, Garcia and yet a different NMEG agent went to Castellanos's apartment, arriving at about 4:30 p.m. Castellanos, defendant Lara, Pedro Cerda, Pedro's wife Maria, and the Cerdas' son were inside the apartment when Garcia and the agent arrived. Garcia and the agent were introduced to the group, and the agent asked if they were ready to purchase the cocaine. Castellanos said that they were ready but wanted to see "the three" first. Garcia and the agent responded by asking about the money, which Lara twice assured them had been properly counted and amounted to $67,-500. They then discussed the quality of Garcia's cocaine. Garcia described the three

kilograms as "La Reina," a high quality brand.

As the men pondered their drugs and money, Maria Cerda, in response to a cue from her husband, left the apartment with her son. Pedro told Garcia and the agent that Maria had gone to retrieve the money. Maria returned a few minutes later and dropped off a bag. Maria and the child then left and did not return. Lara took the bag and placed it on a table. He then unzipped the bag, exposing a bundle of money—later counted as $59,500—wrapped in aluminum foil. When the agent saw the money, he gave the arrest signal. DEA agents entered the apartment and placed Castellanos, Lara, and Pedro Cerda under arrest.

After the arrests, Garcia contacted Romero and told him that they had consummated the deal. Garcia agreed to meet Romero to pay him his commission for the sale. For some reason, Romero failed to arrive at the meeting site. Agents apprehended Romero a few days later, however, after a bench warrant had been issued for his arrest.

Romero and Lara, along with Castellanos and Pedro Cerda, were subsequently indicted for conspiracy to possess with the intent to distribute three kilograms of cocaine. 21 U.S.C. §§ 841(a), 846. The four, as well as Cassimoro, were also charged with attempting to possess with intent to distribute three kilograms of cocaine. 21 U.S.C. § 846. Castellanos and Cerda pleaded guilty to the conspiracy count, while Romero and Lara jointly stood trial.[1] The jury convicted Romero on both counts but failed to reach a verdict on Lara. After the district court declared a mistrial as to Lara, he was retried and found guilty on both counts. Romero received a sentence of sixty-three months imprisonment and four years of supervised release, while Lara received a sentence of ninety-seven months imprisonment. Romero and Lara appealed.

## II.

■ Both Romero and Lara assert that the government presented insufficient evidence on which to convict them. We will uphold a jury verdict against a defendant if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). As we have stated often before, this standard places a heavy burden on the defendant challenging the sufficiency of the evidence. *See, e.g., United States v. Theodosopoulos*, 48 F.3d 1438, 1449 (7th Cir.1995); *United States v. Goines*, 988 F.2d 750, 758 (7th Cir.), *cert. denied*, — U.S. —, —, —, 114 S.Ct. 241, 483, 558, 126 L.Ed.2d 195, 433, 458 (1993); *United States v. Gutierrez*, 978 F.2d 1463, 1468 (7th Cir.1992).

■ Romero and Lara each contend that they had nothing to do with the attempted drug deal on March 31, 1993. Romero does not dispute that some persons tried to purchase cocaine, that he had formerly spoken with Garcia about drugs, or even that he wanted to broker a drug deal. Rather, Romero asserts that he had nothing to do with this particular conspiracy and transaction. He argues that the government failed to provide sufficient evidence linking him to the events of March 31, 1993.

Lara's defense is somewhat similar although more elaborate: He admits that he was at the scene of a crime but suggests that his presence was merely an unfortunate happenstance and that ignorance and fear of the police led him to sign a post-arrest confession. Lara, who owned a video store with his brother, testified that he was in the store on the morning of March 31 when Pedro Cerda came by the store. Lara said that he had stomach ailment and that he intended to visit a faith healer, Pedro Morciego, to help with the condition. Cerda agreed to drive Lara that afternoon to see Morciego. According to Lara, Cerda, Cerda's wife Maria, and their child came by around 2:00 to pick him up. The four drove to Morciego's, Lara met with Morciego—a meeting collaborated by Morciego's testimony—and then left. On the way back to the video store, Lara contends,

---

**1.** Cassimoro is currently a fugitive, and a bench warrant for his arrest has been issued.

the Cerdas insisted on stopping by an apartment to see some friends. Lara says he went inside this apartment—Castellanos's— only to use the bathroom, because he still had stomach pains. Lara asserts that he was just coming out of the bathroom when the DEA agents raided the apartment. He was, in other words, merely present at the apartment, and "[e]vidence of 'mere association with conspirators, knowledge of a conspiracy, and presence during conspiratorial discussions,' without more, will not do the trick." *United States v. Paiz*, 905 F.2d 1014, 1020 (7th Cir.1990) (*quoting United States v. Percival*, 756 F.2d 600, 610 (7th Cir.1985)), *cert. denied*, 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991).

Moreover, Lara continues, he was duped and frightened into confessing to DEA agents. After the arrest, agents brought Lara to their offices and questioned him through an interpreter. Lara, a Mexican immigrant with little formal education and a weak command of English, says that he feared the police "because in Mexico, they beat people up." Lara maintains that he signed a piece of paper after a brief interrogation because an agent "told me that if I signed the paper that he would let me go, that I wasn't guilty of anything." Then, according to Lara, he explained his presence in the apartment to them. The agents supposedly responded to his story by calling him a liar and throwing him in a jail cell.

Both defendants also question the validity of Garcia's testimony, which formed an important part of the government's case. They emphasize that Garcia was a former drug dealer whose testimony was impeached often; Lara calls Garcia a "consummate liar, none of [whose] testimony can be believed." They point out that he was a paid informant who received twenty-five percent of all money confiscated in deals he set up for the DEA and who expected to be paid about $13,000 in this case. They also assert that he had sold and used drugs during some of the time he was working for the DEA.

The record does not support the contentions of either Romero or Lara. As for Romero, ample evidence demonstrated his prior conversations with Garcia and his attempts to put Garcia in touch with buyers. Although Romero denies that the deal that occurred was *his* deal, the government presented a taped conversation between Garcia and Romero minutes after the arrest in which Garcia told Romero that "the thing is that everything is ready." Romero responded, "How did everything come out?", and when Garcia said that it was fine, Romero said, "That's good." The two then made arrangements for Garcia to deliver Romero a commission. Although Romero asserts that either Cassimoro or Castellanos brokered the deal, and notes that he was not at Castellanos's apartment on March 31, Romero makes no attempt to controvert the March 31 telephone call or its peculiar timing. Nor can Romero adequately address his drug-related conversations with Garcia in the days preceding March 31, 1993. Indeed, even if we assumed Garcia was a craven liar, that assumption would not explain away the incriminating evidence against Romero.

Lara's argument fares little better. Garcia, his recollection refreshed by a transcript of the conversations inside the apartment on March 31, 1993, testified that Lara both assured him the money was "properly counted" and showed him the money. Garcia further testified that Lara made inquiries about the quality of the cocaine to be purchased and assured him that he, Lara, had experience at drug selling. The agent who was present during the attempted cocaine sale corroborated Garcia's story, as did other agents. Although, as Lara repeatedly points out, Garcia does not have the profile of a model citizen, Lara's credibility was also impeached on a substantial number of points. In the end, the jury clearly believed Garcia's account of the drug deal and discounted Lara's version. That is the jury's prerogative; an appellate court does not sit to reweigh the credibility of witnesses. *United States v. Davis*, 48 F.3d 277, 281 (7th Cir. 1995); *United States v. Ford*, 21 F.3d 759, 761 (7th Cir.1994).

Additionally, Lara was arrested at the deal with a razor blade and $896 dollars in cash on his person. Lara testified at trial that he had the razor blade in his pocket because he used it at the video store to open packages

and that he had the cash because he was going to pay his rent. Yet possession of a razor blade and a large amount of cash also comports with an intention to purchase cocaine. Again, the jury had to choose whether to believe Lara and decided against doing so.

Lara also tries to justify his post-arrest statement in which he confessed to the crimes charged against him, as well as other statements in which he admitted not only his intent to purchase cocaine on March 31, 1993, but also his prior drug purchases. Lara says he acted only out of fear of the police and says that the agents lied to him about what he was signing. The government, however, points to testimony that the agents who interviewed Lara twice advised him of his rights before speaking with him or taking his statement. As with almost every other piece of the government's case against him, Lara does offer an alternative explanation. Alternative explanations alone, even if plausible, do not ordinarily overcome the defendant's burden in challenging the sufficiency of the evidence. *See United States v. Maholias,* 985 F.2d 869, 874 (7th Cir.1993).

"Guilt by association is not a permissible theory of criminal liability even in the war against drugs." *United States v. Zafiro,* 945 F.2d 881, 888 (7th Cir.1991), *aff'd,* —— U.S. ——, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). In the instant case, the government presented substantial evidence against both defendants that went far beyond Romero's mere acquaintance with Garcia or Lara's supposedly being in the wrong apartment at the wrong time. *Cf. United States v. Burrell,* 963 F.2d 976, 994 (7th Cir.) ("We are not persuaded by [defendant's] argument that he was merely going along with some suspect activity."), *cert. denied,* —— U.S. ——, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992). That presentation was more than enough.

### III.

Romero raises two additional challenges to his conviction. He suggests that the district court improperly admitted the testimony of a narcotics expert at his trial. Romero also argues that the court should not have given the jury a supplemental instruction defining the term "possession." Both decisions, Romero asserts, unfairly prejudiced him by distracting the jury from the relevant issues in his case.

### A.

▮▮▮ First, Romero contends that the district court should not have permitted a narcotics agent, Kevin Lane, to testify as a government expert regarding the drug trade. Over the objections of Romero's counsel, Lane testified about the amount and value of the cocaine in question in order to show that the sum Romero and his co-defendants intended to purchase was likely not for personal consumption. Lane also discussed the packaging of cocaine and how a kilogram of cocaine would look to a dealer in the course of a trade. Finally, Lane spoke about the use of code words in drug deals. Lane noted that dealers often use items of commerce (e.g., "three pairs of boots") in order to simplify negotiations and make them seem ordinary. *See, e.g., United States v. Jones,* 55 F.3d 289, 291 (7th Cir. 1995) ("pianos" sold by the kilogram). Additionally, Lane spoke about the term "La Reina" and its significance in the cocaine trade as a designation of origin and quality.

▮▮▮ Romero objects to this testimony as both inadmissible under Fed.R.Evid. 702, because it was admitted to prove matters already within the understanding of the jurors, and unfairly prejudicial under Fed.R.Evid. 403, because it tarred the defendant with the terms of the drug trade without actually demonstrating anything relevant. In general, expert testimony is admissible under Rule 702 if it is "specialized knowledge" that "will assist the trier of fact to understand the evidence or to determine a fact in issue." We will reverse the admission of expert testimony only if the defendant shows that the district court committed "a clear abuse of discretion." *United States v. Brown,* 7 F.3d 648, 651 (7th Cir.1993). We will reverse the admission of testimony because of its unfairly prejudicial value under the same circumstances. *United States v. Hawkins,* 823 F.2d 1020, 1023 (7th Cir.1987).

Romero bases his objections primarily on the Second Circuit's decision in *United States v. Castillo,* 924 F.2d 1227 (2d Cir. 1991). In *Castillo,* Castillo and Fernandez had sold cocaine to an undercover agent. Before the agent could leave the scene of the sale, however, Castillo had placed a line of cocaine under the agent's nose while another co-defendant threatened the agent with a gun. The defendants refused to let the agent depart until he had tried some of what he purchased. *Id.* at 1229. At trial, the government offered the testimony of a narcotics officer as an expert on the cocaine trade in the area of Manhattan where the deal had occurred. The expert testified that drug dealers in this area often forced cocaine customers to sniff some of what they had bought in order to flush out undercover agents. *Id.* at 1231. The expert also testified about operations of these dealers, noting the materials typically found within their work areas, including scales, tinfoil, plastic sandwich bags, plastic playing cards, and guns. *Id.*

The Second Circuit, in reversing the defendants' convictions, ruled that this testimony did not fall within the province of Rule 702. It held that jurors were perfectly capable of comprehending the events during the cocaine purchase without anyone telling them why a gun was held to the agent's head. *Id.* at 1232. Furthermore, the court continued,

> we are not convinced that New York jurors in today's climate, flush with daily news of the latest drug bust, need an expert to enlighten them as to such elementary issues as the function of a scale or index card in a drug deal. The need is even less apparent when an eye-witness, as in this case Officer Johnson, has already explained or described the relevant procedures or equipment.

*Id.* at 1233. *See also United States v. Cruz,* 981 F.2d 659, 664 (2d Cir.1992) ("We hold only that the operations in question must have esoteric aspects reasonably perceived as beyond the ken of the jury and that expert testimony cannot be used solely to bolster the credibility of the government's fact-witnesses by mirroring their version of events."); *United States v. Long,* 917 F.2d 691, 702 (2d Cir.1990) (noting similar concerns about expert testimony regarding a kickback scheme).

While we hesitate to confirm the all-too-pervasive conceit that the average juror in New York is more sophisticated than her midwestern counterpart, we are reluctant to extend the implications of *Castillo* to the instant case. *Castillo* was likely correct on its facts: jurors probably do not need an expert to tell them why someone might hold a gun to a man's head with one hand and shove a line of cocaine under his nose with the other. Nor do jurors necessarily require assistance in drawing conclusions from the presence of scales and baggies, although that is a closer issue. But our society has not progressed (or rather, descended) to the point where the tools of the drug trade are familiar to all. *See United States v. Foster,* 939 F.2d 445, 451–52 (7th Cir.1991) ("Despite our country's 'war on drugs' and its accompanying media coverage, it is still a reasonable assumption that jurors are not well versed in the behavior of drug dealers."). Unlike the testimony in *Castillo,* Agent Lane's testimony explained matters about which the average juror may not have known. That testimony also helped prove important elements of the government's case. His explanation of cocaine packaging and amounts tended to show that the buyers intended to purchase cocaine in amounts far beyond that needed for personal consumption. His explanation of code words also assisted in putting that element of the transaction into its proper context. We have approved all these uses of expert testimony before, *see, e.g., Brown,* 7 F.3d at 652 (collecting cases), and we do so again today.[2] We thus agree with the First Circuit's conclusion that *Castillo's* "pronouncement seems to us too broad to be

---

2. We therefore decline Romero's invitation to overrule *Foster* and related cases. We note also that Romero objected only to Lane's testimony in general and not to specific parts of that testimony. While objections to particular elements of Lane's testimony would not have affected our decision in this case, we recommend that method of proceeding in the future. We are more likely to consider specific aspects of expert testimony about the drug trade objectionable than to hold the entirety of a witness's testimony inadmissible.

workable." *United States v. Montas*, 41 F.3d 775, 784 n. 4 (1st Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1986, 131 L.Ed.2d 873 (1995).

Furthermore, the Second Circuit itself has recognized the limited scope of *Castillo*. In *United States v. Taylor*, 18 F.3d 55, 60 (2d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 2720, 129 L.Ed.2d 845 (1994), the court specifically held admissible expert testimony about quantities of heroin that tended to show a defendant's intent to distribute rather than possess for personal consumption. In *United States v. Tapia–Ortiz*, 23 F.3d 738, 741 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 206, 130 L.Ed.2d 136 *and* —— U.S. ——, 115 S.Ct. 286, 130 L.Ed.2d 201 (1994), the court determined that testimony about weight, purity, dosages and prices of cocaine, and the use of beepers, nicknames, and code words was "knowledge beyond the ken of the average jury." The *Tapia–Ortiz* court also emphasized that a fair portion of the court's concern in *Castillo* related to the duplicative nature of the expert testimony; the *Castillo* expert had merely recapitulated inferences about which the fact-witnesses had already spoken. *Id.* at 740–41; *see also Headley v. Tilghman*, 53 F.3d 472 (2d Cir.1995) (distinguishing *Castillo* and *Cruz* in holding admissible expert testimony about a drug distribution house, its contents, and a beeper and cash found on the defendant's person); *United States v. Duncan*, 42 F.3d 97, 101–02 n. 3 (2d Cir.1994) (distinguishing *Cruz* in admitting expert testimony regarding tax evasion). Indeed, the *Castillo* court even recognized "that the operations of narcotics dealers are a proper subject for expert testimony under Fed.R.Evid. 702." *Castillo*, 924 F.2d at 1232.

Romero's argument under Rule 403 also fails. "Our general acceptance of this type of testimony notwithstanding, we are not unmindful of its potential for undue prejudice."

*Foster*, 939 F.2d at 452; *see also United States v. Curry*, 977 F.2d 1042, 1051 (7th Cir.1992) (noting that testimony that would be "unduly confusing or a waste time" should be excluded under Rule 403), *cert. denied*, —— U.S. ——, 113 S.Ct. 1357, 122 L.Ed.2d 737 (1993). Such prejudice did not occur here. Agent Lane's testimony was brief and discussed only a limited range of issues. His testimony was not redundant and did not unfairly paint Romero as someone who knows too much about the drug trade. To the contrary, the evidence was relevant because it helped prove important elements of the government's case: the intent to purchase cocaine and the intent to distribute it. The district court did not abuse its discretion in admitting this testimony.

## B.

■■■■■ Romero also objects that the district court provided the jury with a supplemental instruction defining the term "possess." Shortly after jurors began deliberating, they requested from the court a definition of "possess." Although the district court had not charged the jury with such a definition, the court decided to give the jury a supplemental instruction previously sanctioned by this Court in *United States v. Rice*, 995 F.2d 719, 724–25 (7th Cir.1993), and *United States v. Stockheimer*, 807 F.2d 610, 615 (7th Cir.1986), *cert. denied*, 481 U.S. 1018, 107 S.Ct. 1899, 95 L.Ed.2d 506 (1987).[3] Romero contends that the instruction was unnecessary and that it unfairly highlighted this aspect of the case and thereby deprived Romero of his right to a fair trial. We review the district court's decision to provide the jury with a supplemental instruction for abuse of discretion. *United States v. Sanders*, 962 F.2d 660, 677 (7th Cir.), *cert. denied*, —— U.S. ——, ——, 113 S.Ct. 262, 284,

---

**3.** The judge gave the jury the following supplemental instruction:

The law recognizes two kinds of possession, actual possession and constructive possession. A person who knowingly has direct physical control over a thing at a given time is then in actual possession of it. A person who, although not in actual possession, knowingly has the power and intention at a given time to

exercise dominion or control over a thing either directly or through another person or persons is then in constructive possession of it.

The law recognizes also that possession may be sole or joint. If one person alone has actual possession or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.

121 L.Ed.2d 192, 210 (1992); *United States v. Franco,* 874 F.2d 1136, 1143 (7th Cir.1989).

As the government points out, the supplemental instruction properly stated the law and correctly responded to the jury's inquiry. Romero's sole objection is that the instruction was unnecessary at best: there never was "actual possession" because there never was actual cocaine. Nonetheless, the government still bore the burden of proving some sort of possession, and the definition was relevant to understanding what the government was asserting. The district court also took pains to avoid highlighting the instruction by reminding the jury that it "shouldn't make [its] determination based on what one instruction says" and by placing the supplemental instruction in the middle of the jury instruction packet handed to the jury. Without question, the court was within its discretion in providing the jury with this instruction.

## IV.

■■■■ Finally, Lara contests the district court's decision to enhance his sentence for obstruction of justice under U.S.S.G. § 3C1.1, thereby raising his offense level from 28 to 30 and his sentencing range from 78 to 97 months to 97 to 121 months. The district court based its obstruction enhancement on a finding that Lara had perjured himself by testifying that he never intended to go to Castellanos's apartment and was only an unfortunate victim of circumstance. In so doing, the court expressly disagreed with the presentence investigation report's conclusion that the defendant's denial of his involvement in the offense did not impede the investigation of the case. Lara now argues that while § 3C1.1 permits an enhancement for perjury, *see* U.S.S.G. § 3C1.1 application note 3, the district court failed to make the requisite independent findings to support that conclusion. We review the district court's factual determinations in its obstruction of justice assessment for clear error and its interpretations of Guidelines requirements *de novo.* *United States v. Jones,* 983 F.2d 1425, 1429 (7th Cir.1993).

■■■ Lara's contention is wholly without merit. "[W]hen the district court bases a § 3C1.1 enhancement on the defendant's perjury at trial, it should preferably identify each element of perjured testimony, but must at least 'make[ ] a finding of an obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury." *United States v. Austin,* 54 F.3d 394, 404, (7th Cir.1995) (*quoting United States v. Dunnigan,* — U.S. —, —, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993)); *see also United States v. Dillard,* 43 F.3d 299, 308–09 (7th Cir.1994); *Jones,* 983 F.2d at 1430–31. The court may not however, enhance a defendant's sentence merely because the defendant testified at trial and lost. *Jones,* 983 F.2d at 1430. In the instant case, the district court judge, Judge Holderman, spent the better part of the sentencing hearing considering Lara's behavior at trial and explicitly found that he had lied at both trials when he disavowed any knowledge of a drug transaction taking place in the apartment. The judge concluded that "having viewed Mr. Lara myself, and having listened to the evidence in the case regarding that aspect of his testimony, I believe that it was perjurious, and for that basis alone, and that basis alone, that I believe that he committed perjury on that point, that the obstruction of justice enhancement should apply." Judge Holderman admirably complied with the mandates (and precatory dicta) of the Supreme Court and this Court regarding enhancements under § 3C1.1; one could hardly improve upon the specificity of his findings, and those findings were not clearly erroneous.

For the foregoing reasons, Romero and Lara's convictions and Lara's sentence are affirmed.

AFFIRMED.