

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-2-2005

# USA v. Berry

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-2803

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Berry" (2005). *2005 Decisions.* Paper 1076.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1076

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-2803

UNITED STATES OF AMERICA

v.

DONALD BERRY,
Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Criminal No. 01-cr-00545-1
(Honorable John R. Padova)

Argued November 18, 2004

Before: SCIRICA, *Chief Judge*, McKEE and CHERTOFF[*], *Circuit Judges*

(Filed June 2, 2005)

R. DAVID WALK, JR., ESQUIRE (ARGUED)
Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, Pennsylvania 19103
    Attorney for Appellant

---

[*]Judge Chertoff heard oral argument in this case but resigned prior to the time the opinion was filed. The opinion is filed by a quorum of the panel. 28 U.S.C. § 46(d).

BARRY GROSS, ESQUIRE (ARGUED)
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, Pennsylvania 19106
        Attorney for Appellee

---

OPINION OF THE COURT

---

SCIRICA, *Chief Judge*.

On September 12, 2002, following a jury trial, Donald Berry was found guilty of nine counts of cocaine possession, distribution, and conspiracy to distribute in violation of federal law. He was sentenced to 288 months imprisonment, five years supervised release, a $1500 fine, a special assessment of $900, and ordered forfeiture of his assets. He appeals both his conviction and his sentence. The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## Background

The evidence presented at trial established that Berry and his co-defendants, Julian Gonzalez and Hasan Morrison, were involved in an interstate cocaine trafficking ring responsible for the distribution of more than 15 kilograms of cocaine to the Philadelphia area. Detective Freddy Chaves of the Philadelphia District Attorney's Office, who surveilled Berry and his co-defendants for years, used court-authorized wiretaps, intercepted conversations, undercover drug purchases, and evidence obtained from

2

informants to create a 222-page affidavit in support of the issuance of search warrants for defendant's home and Gonzalez's car. These searches produces large amounts of cash, substantial quantities of cocaine, a handgun and ammunition, and several "tally sheets" recording distribution of 22 kilograms of cocaine.

On September 4, 2002, on the first day of trial, co-defendant Gonzalez pled guilty. After two days of testimony co-defendant Morrison followed suit, pleading guilty to two counts of the indictment. Berry was convicted on all counts on September 12, 2002.[1]

Berry raises four primary issues on appeal. First, he appeals the District Court's denial of his motion to suppress the results of the search of his home on the night of July 4, 2001, on the basis that the search warrant was improperly issued. Second, Berry challenges the district court's admission of expert testimony as improper under *United States v. Gibbs*, 190 F.3d 188 (3d Cir. 1999). Next, he argues that his trial was tainted by juror tampering. And finally, Berry challenges his sentence under *United States v. Booker*, 543 U.S. - -, 125 S. Ct. 738 (2005).

---

[1] Appellant Berry was convicted of conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846; four counts of illegal use of a communication facility, in violation of 21 U.S.C. § 843(b); distribution of cocaine, aiding and abetting, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2; and distribution of cocaine within 1,000 feet of a school, in violation of 21 U.S.C. § 860.

**Discussion**

A.  Suppression of Evidence

On the evening of July 4, 2001, detectives and police officers searched Berry's home.  They also searched the vehicle of co-defendant Gonzalez, which was parked outside Berry's residence.  These searches were conducted under a warrant approved orally, over the telephone, by Judge Allan L. Tereshko of the Philadelphia Court of Common Pleas.

In anticipation of applying for a search warrant, Detective Chaves– who had been investigating defendants' cocaine distribution activities for several years– had compiled information in the form of an affidavit prior to any search or search warrant application. The evening of July 4, 2001, he intercepted telephone calls stating that Gonzalez would be coming to Philadelphia, from New York, to make a large cocaine delivery.  At 9:15 on the night of July 4th, Gonzalez's vehicle was stopped in Philadelphia and he was arrested. Chaves contacted Judge Tereshko, the emergency judge on duty.

The District Court found that Judge Tereshko swore Detective Chaves over the telephone, reviewed the contents of the affidavit with Chaves, and orally approved a warrant to search Berry's home and Gonzalez's car.  *United States v. Berry*, 2002 WL 818872 (Apr. 29, 2002).  Judge Tereshko then instructed Detective Chaves to bring the affidavit and warrants to him the following morning, at which point the Judge reviewed

4

the affidavit a second time, signed the warrants, and noted their original issuance at 10:00 p.m. the previous evening. *Id.*

After receiving oral approval for the search warrant on the night of July 4th, Chaves informed Detective Sergeant David Traubel– who, with several other officers, was waiting at Berry's residence– that the warrant had been approved. Traubel then served the warrant and searched the premises. Chaves arrived approximately 15-20 minutes after the search began, and gave a copy of the search warrant to Berry's wife.

The search of Gonzalez's vehicle produced six kilograms of cocaine in 52 individual packages. In Berry's house the officers found a small amount of cocaine, ammunition for a .40 caliber handgun, and $48,000 in cash. The officers also uncovered "tally" work establishing that Gonzalez and Berry had distributed over 22 kilograms of cocaine. In Berry's vehicle, which was parked outside his residence, the officers found a loaded .40 caliber pistol.

Berry moved to suppress this evidence before trial. The District Court denied his motion, reasoning that the search warrant was issued in conformance with Pennsylvania state law and there was probable cause to issue the warrant. The District Court noted the issuing judge reviewed and re-reviewed the contents of the affidavit, which included "extensive information from confidential witnesses and informants relating to Defendant's participation in drug sales, summaries of direct purchases of illicit drugs from Defendant by an undercover detective, summaries of wire intercepts involving

conversations relating to drug transactions, and other surveillance information relating to the Defendant's participation in drug transaction activity." In the alternative, the District Court held that even if the warrant was defective, the fruits of the search were admissible under the good faith exception to the exclusionary rule. We exercise plenary review over the District Court's denial of a motion to suppress. *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002). The District Court's factual findings are reviewed for clear error. *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

Our analysis is governed by federal law. *See United States v. Stiver*, 9 F.3d 298, 300 (3d Cir. 1993) (citing *United States v. Rickus*, 737 F.3d 360 (3d Cir. 1984)) (holding that federal law governs the admission of evidence in a federal prosecution even where the warrant was applied for, issued, and executed by state officers); *see also United States v. Williams*, 124 F.3d 411, (3d Cir. 1997) (quoting *Rickus*, 737 F.3d at 363) ("[F]ederal district courts will decide evidence questions in federal criminal cases on the basis of federal, rather than state, law").

Because our review of the District Court's decision is plenary, we apply the same deferential standard as the District Court in reviewing a magistrate judge's initial probable cause determination. *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993). Specifically, a reviewing court must pay "great deference" to the probable cause determination made by the judge who issued the search warrant. *Illinois v. Gates*, 462 U.S. 313, 236 (1983). Thus, in reviewing Judge Tereshko's probable cause assessment,

6

we do not conduct a *de novo* review; "rather, [we] simply ensure[] that the [judge] had a substantial basis for concluding that probable cause existed." *Jones*, 994 F.3d at 1055. "This does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions; it does require the application of a common sense standard." *United States v. Tehfe*, 722 F.2d 1114, 1117 (3d Cir. 1983) *cert. denied sub nom.*, *Sanchez v. United States*, 466 U.S. 904 (1984).

We confine our review to those facts before the issuing judge. *Jones*, 994 F.2d at 1055. Probable cause exists when, viewing the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. While conclusory statements will not suffice to establish probable cause, proof beyond a reasonable doubt is not required. *Id.* at 235-39. Moreover, "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Ventresca*, 380 U.S. 102, 109 (1965).

Berry contends that Judge Tereshko did not have sufficient facts before him to determine probable cause. Our review of the affidavit, however– which was reviewed over the telephone by the issuing judge and reviewed by him again in person the next morning– convinces us that the warrant was supported by probable cause. The affidavit contained detailed information collected from several confidential informants, intercepted phone calls, an anonymous letter, undercover drug purchases, and personal observations.

This information was collected over three years and paints a detailed picture of a complex and highly organized ring of high-volume cocaine distribution.

Moreover, Detective Chaves sets forth in the affidavit the specific conversations and observations leading up to the cocaine delivery on July 4, 2001. He had received authorization to intercept all communications on Berry's telephone number beginning on June 19, 2001. For each day between June 19 and July 4, the affidavit summarizes all pertinent conversations, in addition to observations gained through surveillance. It is clear from this 67-page portion of the affidavit that there existed more than a "fair probability" that, on the night in question, large amounts of cocaine were being transported to Berry's residence. The cumulative impact of the evidence set forth in Detective Chaves' affidavit provided a substantial basis for Judge Tereshko to infer that a search of Berry's home and Gonzalez's vehicle would yield drug-related evidence. Accordingly, we find the search warrant rested on probable cause. We will affirm the District Court's denial of Berry's motion to suppress.

B. Testimonial Evidence

Berry contends the District Court erred by admitting certain portions of Detective Chaves' testimony. Specifically, Berry argues that Chaves offered improper opinion testimony about the meaning of certain conversations, offered improper explanations for a wide array of street drug terms, and testified as to the meaning of certain symbols on drug tally sheets in violation of *United States v. Gibbs*, 190 F.3d 188 (3d Cir. 1999).

With respect to Chaves' qualification as a narcotics expert, Berry objected at trial to that portion of his testimony concerning coded conversations. During *voir dire*, Chaves testified that he had been qualified as an expert in the past in both state and federal courts; that he had participated in hundreds of drug investigations, had testified in hundreds of cases involving drug investigations, and had interpreted coded conversations in many of those investigations; had attended over fifty seminars in coded and cryptic languages; and that he had over fifteen years of experience in narcotics investigations. The District Court overruled Berry's objection and received Detective Chaves "as an expert on drug investigations including the interpretation of coded and cryptic conversations in drug trafficking." We review for abuse of discretion. *Gibbs*, 190 F.3d at 211. "The trial judge has broad discretion to admit or exclude expert testimony, based upon whether it is helpful to the trier of fact." *Id.* (citing *United States v. Bennett*, 161 F.3d 171, 182 (3d Cir. 1998)).

Berry objected to Chaves' interpretation of three words: "beats," "sneakers," and "teams." Chaves testified that each of these terms was used to refer to cocaine. He testified that he determined the meaning of these code words based on his experience in this drug investigation, other drug investigations, and training seminars on the use of cryptic language in the drug trade. As we explained in *Gibbs*, such expert testimony is entirely proper:

> [I]t is well established that experienced government agents may testify to the meaning of coded drug language under Fed. R. Evid. 702. Because the

9

primary purpose of coded drug language is to conceal the meaning of the conversation from outsiders through deliberate obscurity, drug traffickers' jargon is a specialized body of knowledge and thus an appropriate subject for expert testimony. Such testimony is relatively uncontroversial when it permits a government agent to explain the actual meanings of coded words– that is, when the agent acts as a translator of sorts.

*Gibbs*, 190 F.3d at 211 (citations omitted).

As an expert, Chaves was qualified to explain coded terms to the jury and give his opinion regarding the meaning of these phrases. We find no abuse of discretion. *See Gibbs*, 190 F.3d at 211 ("It was within the scope of [the Agent's] expertise to explain, for example, that 'jawn' meant 'cocaine,' that to 'hit' someone meant to page them on a beeper, that 'on post' meant 'ready and waiting,' and that a 'quarter' meant $2,500."); *see also United States v. Griffith*, 118 F.3d 318, 322-22 (5th Cir. 1997) (permitting narcotics agent to testify that "days of work" means "pounds of marijuana" because "without expert assistance," it is "implausible" to think that jurors could make sense of the "specialized jargon endemic to the illegal drug distribution industry"); *United States v. Delpit*, 118 F.3d 1134, 1144-45 (8th Cir. 1996) (admitting Seargant's translation of drug jargon and street slang– such as the use of "let's go play ball" to mean "let's do a cocaine deal"– because "[t]here is no more reason to expect unassisted jurors to understand drug dealers' cryptic slang than antitrust theory or asbestosis"); *United States v. Romero*, 57 F.3d 565, 570-71 (7th Cir. 1995) (affirming admission of agent's interpretation of code words used in cocaine negotiations, such as "three pairs of boots," because this testimony "explained matters about which the average juror may not have known," "helped prove important

10

elements of the government's case," and "assisted in putting [the code words] element of the transaction into its proper context").

Berry also objects to Chaves' testimony that "D" on the drug tally sheets referred to Donald Berry. He contends that Chaves' conclusion was not the type of specialized drug knowledge that requires expert testimony to be understood by a jury. He also argues that Chaves' opinion was not based on his drug expertise and was therefore improper expert testimony.

The District Court permitted Chaves to testify to the meaning of "D" on the tally sheet because "[t]he witness has already testified that based on his investigation that Berry from time to time was called D." Chaves was testifying in his capacity as a fact witness, rather than an expert witness, and the government laid a foundation for Chaves' personal knowledge of Gonzalez's tendency to use the nickname "D." The District Court properly admitted this testimony.

C. Jury Tampering

Following the first day of deliberations, one juror reported contact with a spectator in the courtroom who identified himself as Berry's brother. The district court granted the government's motion to excuse this juror, and denied Berry's motion for a mistrial. Berry appeals both rulings. We review the district court's denial of a motion for a new trial, and its investigation of juror contact, for abuse of discretion. *Wilson v. Vt. Castings, Inc.*, 170 F.3d 391, 391 (3d Cir. 1999); *United States v. Bradley*, 173 F.3d 225, 230 (3d Cir. 1999).

11

The jury began deliberating late in the afternoon on September 11, 2002.  After the jury left for the day, juror number one was approached by a trial spectator at the bus stop. The spectator, who juror number one recognized as a former coworker, stated "this is like very stressful to me, that's my brother up there.  And it's not like he murdered anyone." The juror reported this contact to the deputy clerk the next morning.

The Court conducted an *in camera* examination of juror number one.  Berry was informed of his right to be present during the examination, and chose not to attend the proceeding.  Juror number one told the court that no violent words were exchanged, and that her ability to be fair was not affected.  She also stated to the court that she was not concerned for her safety.  She testified that she had informed the other members of the jury about the contact, and that their response had been to inquire whether she felt safe.

The Court then conducted an *in camera* examination of each juror.  All jurors stated that they were able to decide the case based solely on the evidence without regard to the contact revealed by juror number one.  Each juror also stated that they felt comfortable and were not intimidated or worried for their safety.  The court then instructed the jurors not to discuss the comments made by juror number one.

Berry moved for a mistrial, arguing that the statement made by the spectator was the equivalent of a third party proclaiming Berry's guilt.  The District Court ruled as follows:

> We asked questions which were designed to find out what the impact was on these jurors, on a juror-by-juror basis . . . . The Court was impressed

12

favorably that the credibility of the jurors that were interviewed– and all the jurors were interviewed– there weren't any signs or indications, or statements on the part of those jurors that would lead this Court to believe that there was a prejudicial impact upon such juror that at least couldn't be set aside.

And when this Court objectively assesses not only the credibility of the jurors, but all the facts and circumstances concerning the contact, this Court cannot conclude that there was prejudice.

This Court does conclude objectively that this jury can decide this case fairly, objectively, and only on the basis of the evidence, and my instructions to them with respect to the law.

And we believe, and so find, and conclude as a matter of fact, after an objective analysis, that contact with respect to the jurors was a harmless contact from the standpoint that it has not and will not, especially in view of a ruling that I'm going to make on the other motion, impair the jurors' ability to decide this case fairly.

Following its denial of Berry's motion, the District Court ruled upon the government's

motion to dismiss juror number one:

This Court has found the other jurors credible, and this Court does not find juror number one not to be credible. But this Court has concluded that juror number– that the juror in seat number one should be distinguished, in terms of analysis, from the other jurors, for the following reasons, and on the following basis. The continued presence, and presence alone, of the contacted juror in the jury room during deliberations, in my judgment, constitutes a living reminder of the out-of-court contact.

Jurors have received information that juror number one worked with, for a significant period of time, and lived in the same neighborhood with a person that some jurors may believe is related by blood to this defendant or certainly is a friend of this defendant.

And, in my judgment, what that does, it impairs and compromises the ability of juror number one to fairly and fully participate in the deliberations concerning this case. It is, in a sense, another accident waiting to happen.

What will the jurors believe, what will the jurors think when juror number one participates in deliberations? Will they give more weight or less weight to the views of juror number one, in view of the fact that some

13

of them may believe that juror number one is a friend of the brother of this defendant, or at least is a friend of a friend of this defendant? . . . .

And this Court believes that the presence of juror number one, through no fault of juror number one– she didn't invite this contact– but the presence of juror number one impairs and distracts from the entitlement to these parties to have 12 fully deliberating jurors.

We find the District Court was within its discretion in denying Berry's motion for a mistrial and granting the government's motion to dismiss juror number one.

Extra-jury contact poses a serious possibility of prejudice. "It has long been recognized that when jurors are influenced by the media and other publicity, or when they engage in communications with third parties, these extra-record influences pose a substantial threat to the fairness of the criminal proceeding because the extraneous information completely evades the safeguards of the judicial process." *United States v. Resko*, 3 F.3d 684, 690 (3d Cir. 1993). Indeed, in a criminal case, "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." *Remmer v. United States*, 347 U.S. 227, 229 (1954); *see also United States v. Console*, 13 F.3d 641, 666 (3d Cir. 1993) (holding that presumption of prejudice applied to third-party communication between juror and juror's family member about the meaning of RICO).

This presumption of prejudice, however, "is not conclusive." *United States v. Vega*, 285 F.3d 256, 266 (3d Cir. 2002) (citing *Remmer*, 347 U.S. at 229). Rather, the

14

government bears the burden of rebutting the presumption by demonstrating that the "improper communication did not and will not prejudice the defendant." *Id.* The District Court generally conducts *voir dire* of all potentially affected jurors "to probe adequately the possibility of prejudice." *Id.* (citing *Waldorf v. Shuta*, 3 F.3d 705, 710 (3d Cir. 1993)). In reviewing whether the government rebutted the presumption of prejudice, "we make our 'determination on the basis of an objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror.'" *Console*, 13 F.3d at 666 (quoting *United States v. Gilsenan*, 949 F.2d 90, 95 (3d Cir. 1991)).

In this case, the District Court questioned each juror individually, *in camera*, to determine the effect of the spectator's comments. The court conducted a thorough inquiry during *voir dire*, questioning each juror as to knowledge of the spectator's comments, the effect of these comments on the ability to decide the case fairly and objectively, and the sense of safety for the juror and for juror number one as a result of the out-of-court contact. On the basis of this *voir dire*, the court concluded that each juror was credible, impartial, and capable of following the court's instructions to decide the case based solely upon the evidence presented at trial. The District Court thus found the government had rebutted the presumption of prejudice which attaches to out-of-court juror communications.

"We have deferred to district court evaluations of juror misconduct in cases where the court conducted individualized voir dire examinations," and we will do so here.

15

*Console*, 13 F.3d at 667. The District Court conducted extensive *voir dire* and concluded that defendant was not prejudiced. We find the District Court's questioning was designed to elicit answers which provided an objective basis for its evaluation. Moreover, we have reviewed the *voir dire* transcript and are also convinced, based upon each juror's responses, that Berry was not prejudiced by the third-party contact. Thus the District Court acted within its discretion in denying his motion for a mistrial.

We will also affirm the District Court's decision to excuse juror number one. Despite the District Court's belief that juror number one was credible, it concluded that her presence posed a threat to the fairness of the deliberations, and to "the ability [of] the jury to focus only on the evidence and on the law as the Judge has given it to them." Juror number one stated that she believed herself able to be impartial, and that the third-party contact would not affect her ability to decide the case impartially. While we do not question the sincerity of these statements, we believe the District Court was in the best position to evaluate the potential effect of juror number one's presence on the jury. *See Resko*, 3 F.3d at 690 (citing *United States v. Chiantese*, 582 F.2d 974, 980 (5th Cir. 1978)). One juror stated that she was worried about her safety should juror number one "tell him my name." The District Court considered this statement, in addition to other effects of juror number one's continued presence, and determined that juror number one should be excused. The District Court has discretion "to decide how to deal with a situation in which there is an allegation of jury misconduct," and "[t]his discretion

16

extends to the determination of whether prejudice has been demonstrated." *Resko*, 3 F.3d at 690. We will affirm.

D. <u>Sentencing</u>

Berry challenges his sentence under *United States v. Booker*, 543 U.S. - -, 125 S. Ct. 738 (2005). Having determined that the sentencing issues appellant raises are best determined by the District Court in the first instance, we will vacate the sentence and remand for resentencing in accordance with *Booker*.

## Conclusion

For the foregoing reasons, we will affirm the conviction, vacate his sentence, and remand for resentencing.